Joseph BIANCO, et al., Plaintiffs,

v.

TEXAS INSTRUMENTS, INC., et al., Defendants.

No. 85 C 376.

United States District Court,
N.D. Illinois, E.D.

Oct. 11, 1985.

Phillip L. Stern, Jerrold E. Salzman, Daniel Clune, Deborah Bornstein, Richard Davis, Lee Freeman, John F. Kinney, Freeman, Freeman & Salzman, for plaintiffs.

Jacob H. Stillman, Rosalind C. Cohen, Richard A. Levine, Washington, D.C., Edward G. Kohler, for S.E.C., amicus curiae.

Stephen P. Beddell, Gardner, Carton & Douglas, Robert F. Finke, Mayer Brown Platt, Hope G. Nightinga, Bartlett H. McGuire, Ialis Polk Wardell, New York City, James E. Dahl, James E. Dahl & Associates, Ronald P. Kane, John F. Stimson, Siegan, Barbakoff, Gomberg, Gordon & Elden, Ltd., for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

This is a securities action brought pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5. The plaintiffs are options traders who purchased and/or sold options contracts on Texas Instruments, Inc. common stock during the period from June 6, 1983, to June 10, 1983. The defendants are Texas Instruments, Inc. ("TI") and five named individuals. All of the defendants have filed motions to dismiss the complaint, or in the alternative, to transfer the case to the Northern District of Texas.

## FACTS

The seventeen plaintiffs in this case are individuals and corporations who traded in options contracts in TI stock on the Chicago Board of Options Exchange ("CBOE"). All of the plaintiffs, with the exception of Sheldon Jospey, are citizens and residents of the Northern District of Illinois, and all apparently opted out of a similar class action brought by stock and options traders against TI in the Northern District of Texas. *Council on Social Work Education v. Texas Instruments, Inc.*, Nos. 3–83–1083, 1167, 1204 and 1373–H (N.D.Tex.).[1]

The named defendants are Texas Instruments, Inc. and four present or former employees of the Consumer Products Group of TI who allegedly traded in TI options: Joseph C. Fox, David L. Ball, Patricia J. Randall and Carl J. Fleece. These four employees are also defendants in an SEC enforcement action in Texas based on the same transactions at issue in this case. *SEC v. Fox*, No. CA5–84–172 (N.D.Tex.).[2] A fifth individual, Emery Spears, is a self-employed barber, who is not a TI employee but who allegedly traded in TI options using improperly obtained inside information.[3] TI is a Delaware corporation headquartered in Dallas, Texas, and all of the individual defendants are residents of Texas.

For the purpose of deciding defendants' motions to dismiss, we must assume that the following facts alleged in plaintiffs' first amended complaint are true. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Ashbrook v. Hoffman*, 617 F.2d 474, 475 (7th Cir.1980). During the time prior to March 1, 1983, TI made repeated public announcements projecting favorable earnings as a result of increasing sales of its 99/4A home computer products. On March 1, 1983, TI issued a press release stating that it was voluntarily correcting a potential defect in the 99/4A home computer. The cost of this correction and the anticipated loss in sales would have a negative impact on the company's first quarter earnings in 1983; however, TI's Chairman of the Board and Chief Executive Officer was quoted as saying that "1983 still holds the promise of being a significantly better year for TI than 1982." First Am.Comp., ¶ 19. In May 1983, TI issued a report of its April stockholder meeting and its first quarter results. The report stated that net sales overall had increased nine percent over the first quarter of 1982, and noted that the home computer defect had prevented sales of that product for a month. Nonetheless, it was

---

1. Counsel for TI informed us in April 1985 that the district court in Texas had issued a final judgment order in the class action approving a settlement between the parties. Letter from Bartlett H. McGuire, April 17, 1985.

2. We granted leave for the SEC to file an *amicus curiae* memorandum in response to the motions to dismiss submitted by defendants Fox, Ball, Randall and Fleece. Order of April 10, 1985. The SEC filed its appearance and memorandum on May 2, 1985, on the question of whether § 10b and Rule 10b–5 prohibits insider trading of options as opposed to common stock.

3. This suit is also brought against Does 1 through 50, who are individuals who engaged in large-scale purchases of TI options and stock based on inside information improperly received from one or more of the named defendants; and Does 51 through 56 who are brokerage houses that aided and abetted the alleged securities violations by facilitating and suggesting the options and stock trades based on improper inside information.

reported that "production of home computers continued at an accelerated pace," and that despite the difficulties with the 99/4A home computer, "[c]onsumer electronics should be an important contributor to TI this year." The report concluded that "1983 holds the promise of being a significantly better year for TI than 1982." First Am.Comp., ¶ 20.

Despite these public statements, TI was actually experiencing a substantial decline in the demand for its home computer products, and the company was oversupplying its inventory of 99/4A computer products. In addition, price competition in the home computer industry had eroded TI's profit margins and TI was not keeping pace with its competitors in reducing manufacturing costs. Beginning in late April, TI's top executives began meeting with members of the Consumer Products Group to consider possible actions in light of the home computer difficulties. During May, the Consumer Products Group considered reducing its home computer production for 1983 by 41 percent. On June 2, 1983, TI's president met with certain officers at the Consumer Products Group headquarters in Lubbock, Texas, and considered these reductions along with proposed reductions in the monthly, quarterly and annual Consumer Products Group forecasts. On June 3, 1983, a special meeting of the Board of Directors was called for June 10, and on June 6 the regularly scheduled monthly Consumer Products Group forecasting meeting was moved from June 9 to June 8 in order to prepare for the Board meeting. Also on June 6, the Consumer Products Group recommended that production and forecast figures be significantly reduced.

The company's Board of Directors met on Friday, June 10, 1983. Following this meeting, TI issued a press release stating that it could lose "as much as $100 million" during the second quarter of 1983 as a result of "recent developments" in its home computer operations. First Am.Comp., ¶ 25. The release stated that "it now appears that 1983 will be a significantly poorer year for the company than 1982." *Id.* This press statement was not made public until after the securities markets had closed on June 10, and on Monday, June 13, when the markets opened, trading in TI stock on the New York Stock Exchange was delayed by approximately 2½ hours because of the disproportionate number of sell orders. When trading opened, the price of TI stock was $119 per share, as compared to its June 10 closing price of $157.75 per share, and closed on June 13 at $117.75 per share.

During the week from June 6 to June 10, all seventeen plaintiffs traded in options on TI stock on the CBOE, allegedly relying on TI's March and May reports concerning its financial outlook. Nine of the plaintiffs also made "long" purchases of TI common stock on the open market that same week. First Am.Comp., ¶ 4. During the same time period, the individual defendants in this case traded in TI options on the CBOE, using the inside information that TI was experiencing serious difficulties with its home computer products and was about to make a major change in forecasts and production.[4] As a result of this insider trad-

---

**4.** All of the parties in this case have made admirable attempts at explaining the unique nature of the options market to the court, which we will now attempt to paraphrase. Options traded on the CBOE are issued by the Options Clearing Corporation, a clearing agency that is regulated by the SEC. Options contracts on common stock are described as either "puts" or "calls." A "put" option conveys the right to *sell* a specified number of shares in the underlying common stock for a specified "exercise price" at or before a specified time, or "expiration date." A "call" option conveys the right to *buy* a specified number of shares for a specified exercise price at or before the specified expiration date. Under the rules of the Options Clearing Corporation, the expiration date falls on the Saturday following the third Friday of the expiration month identified in any given options contract. Accordingly, at the time of the events alleged in this lawsuit, at TI "July 140" put entitled its holder to sell 100 shares of TI common stock at $140.00 per share on or before Saturday, July 16, 1983; and a TI "July 140" call entitled the holder to buy 100 shares of TI stock at $140.00 per share on or before the same date. The individual defendants in this case allegedly purchased July 140 puts, July 150 puts and October 140 puts during the week of June 6, 1983, for prices as low as $1.00 per underlying share. These put contracts

ing, and because of TI's delay in correcting its allegedly false financial statements, plaintiffs suffered losses in excess of $5 million.

Count I of this suit to recover those losses states a Rule 10b–5 claim against TI for making false and misleading statements concerning its financial outlook and for withholding corrective statements. Count II of the complaint is directed against the named and as yet unidentified individual defendants who engaged in insider trading in TI options. Count III is a common law fraud action against all defendants, alleging that the defendants knew of TI's anticipated losses but failed to disclose this information correcting the prior misrepresentations made by the company. These fraudulent misrepresentations and omissions were made with the intent of encouraging plaintiffs to sell TI puts, purchase TI calls and buy TI stock "long."

## DISCUSSION

### Motion to Dismiss by TI

#### Standing of Options Traders to Sue

Defendant Texas Instruments has moved to dismiss the claims based on options transactions.[5] TI claims that options traders have no standing under § 10(b) or Rule 10b–5 [6] to sue the issuer of the underlying

---

conveyed the right to sell TI stock at $140.00 per share or $150.00 per share in July and October when the defendants allegedly knew that TI stock would be worth considerably less due to the difficulties in the Consumer Products Group. Following the announcement of TI's revised financial forecasts on June 10, the price of put contracts rose dramatically, and defendants were able to sell their puts for prices as high as $139.00. The price of July call contracts, which conveyed the right to buy TI stock in July at now unrealistically high prices decreased; the closing price on call contracts on June 10 prior to the announcement was $19.50 per underlying share, while the closing price on June 13 was $1.50. Plaintiffs in this case allegedly sold put contracts during the week of June 6 and bought call contracts, thereby losing money when the market in TI options contracts turned around following the June 10 press release.

5. TI's motion to dismiss and supporting memoranda were directed at plaintiffs' original complaint, which only alleged that plaintiffs had bought and sold options on TI stock. Three months after TI's motion to dismiss was filed, plaintiffs filed their First Amended Complaint, which added allegations as to the long purchases of TI common stock made by nine of the plaintiffs. The amended complaint does not detail the amount of common stock purchases involved in this cause of action; the only allegation as to this issue is a statement that one unidentified plaintiff purchased 1,000 shares long on June 6, for a loss one week later of $42,000.00. First Am.Comp., ¶ 16. TI, in it supplemental memorandum requested by the court following the filing of the amended complaint, apparently concedes that the plaintiffs who purchased common stock have standing to assert the claims contained in the complaint. TI's motion to dismiss, therefore, is only addressed to the claims of those plaintiffs who purchased only options, and to the options-related claims of the remaining nine plaintiffs. Memorandum with Respect to the Addition by Certain Plaintiffs of Rule 10b–5 Claims Based on Purchases on TI Stock, at 2. TI believes that the overwhelming majority and dollar volume of plaintiffs' claims are based on options transactions. *Id.*, at 3.

6. Section 10(b) reads in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b–5 reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

security for allegedly misleading statements because there is no fiduciary relationship or obligation between the issuing corporation and the options trader.[7]

TI points out that options contracts are not written or sold by the corporation issuing the underlying common stock, but are instead written by the Options Clearing Corporation. The common stock issuer, in this case TI, derives no financial benefit from the options transactions, and in fact may be harmed inasmuch as the options market draws purchasers who might otherwise buy common stock and invest directly in the corporation.[8] Because the options trader does not actually purchase shares of the underlying issuer, there is no transactional or fiduciary relationship between the options trader and the issuer, and the issuer does not owe the trader a duty to disclose material information. Therefore, the options trader cannot sue for breach of a duty that does not exist.

In support of its argument, TI cites the Supreme Court's decision in *Chiarella v. United States*, 445 U.S. 222, 228–30, 100 S.Ct. 1108, 1114–16, 63 L.Ed.2d 348 (1980), in which the Court held that a duty to disclose material information arises only when there exists a "relationship of trust and confidence" between the defendant and the injured party. The defendant in *Chiarella* was a printer who inferred the identify of a corporation that was the target of a takeover attempt from documents sent to his employer for printing. Using this inside information, the defendant purchased shares in the target corporation, and then sold the shares at a profit immediately after the takeover was made public. The Court found that the defendant did not violate the securities laws, despite the fact that he bought shares with improperly obtained inside information, because he was not a corporate insider and was not a fiduciary or agent of the injured sellers. "He was, in fact, a complete stranger who dealt with the sellers only through impersonal market transactions," and as such did not owe the sellers a duty to disclose his inside information. *Id.*, at 232–33, 100 S.Ct. at 1116–17. *See also Dirks v. Securities and Exchange Commission*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (a tippee does not violate Rule 10b–5 unless the insider's "tip" was a breach of fiduciary duty, generally determined by the personal benefit the insider derives from the tip.).

Relying on *Chiarella*, the Eighth Circuit Court of Appeals held in *Laventhall v. General Dynamics Corp.*, 704 F.2d 407 (8th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983), that there was no relationship between options traders and the corporations issuing the underlying common stock where the corporation itself engages in insider trading without disclosing material facts. The issuing corporation had purchased its own common stock on the open market without disclosing that it would soon declare the first cash dividend in eight years. Although the corporation had violated § 10(b) as to persons trading in the stock of the corporation, there was no "transactional nexus" between the corporation and the plaintiff options traders. The court held that:

> Had plaintiff been contemporaneously trading in the same market, that is, buying and selling common stock at the same time defendant was trading, there would arguably exist a transactional nexus that defendant had profited through the purchase of stock, whereas plaintiff

**7.** TI does not argue, nor can it, that options contracts are not covered by the terms of the federal securities laws, since the 1934 Act explicitly provides that the "right to subscribe to or purchase" stocks are "securities." 15 U.S.C. § 78c(a)(10); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750–51, 95 S.Ct. 1917, 1932–33, 44 L.Ed.2d 539 (1975).

**8.** Plaintiffs and the SEC counter this argument by citing studies indicating that the existence of the options market in fact enhances trading in the underlying common stock by increasing liquidity and permitting large institutional investors to hedge their purchases and sales. Memorandum in Opposition to Texas Instruments' Motion to Dismiss or Transfer, at 11–12; Memorandum of the Securities and Exchange Commission, Amicus Curiae, at 7–8. We do not decide this particular question one way or the other, as it does not affect the result we reach.

contemporaneously had sustained a loss through the sale of his stock due to the imbalance of information. The legal justification for liability of the corporate insider to the outside uninformed investor is that if the insider trades on the basis of the inside information it may profit at the expense of outside investors who are disadvantaged in the same or similar transaction by lack of the inside information. Thus, in this hypothetical transaction there is a direct nexus between the defendant's gain and the plaintiff's loss.

However, the same analysis cannot be applied to a transaction between an options holder dealing with a third party and the corporate insider or his tippee dealing with shares of stock. There is only a speculative relationship between the insider's trading and the alleged loss caused to the options holder. It may be true that the nondisclosure may have had some indirect effect on the option premium, but the insider's trading of stock on the stock market has no transactional nexus with the option holder's loss on the options exchange.

*Id.*, at 412. Without this transactional nexus, a corporate insider could be found "liable to all the world," and so the court held that the duty to disclose does not arise unless there is "some special relationship" between the plaintiff and defendant in a § 10(b) case. *Id.*, at 413. The *Laventhall* rule has been extended by one court to dismiss an action brought by options traders against an issuing corporation that did not trade in either options or its own stocks, but simply failed to disclose certain material adverse business and financial information. *In re McDonnell Douglas Corp. Securities Litigation*, 567 F.Supp. 126 (E.D.Mo.1983).

TI urges us to follow *Laventhall* and *McDonnell Douglas*, arguing that it did not owe any duty to the plaintiff options traders in this case. Plaintiffs contend, however, that the corporate defendant in *McDonnell Douglas* merely failed to disclose information to the public; here, plaintiffs allege that TI's conduct went beyond nondisclosure because TI's March and April financial reports were actually affirmative misrepresentations.[9] Plaintiffs maintain that a different rule is required when the corporate issuer engages in affirmative misrepresentation as opposed to mere nondisclosure, citing *In re Digital Equipment Corp. Securities Litigation*, 601 F.Supp. 311 (D.Mass.1984). The corporate defendant in *Digital Equipment* allegedly issued public statements indicating that it expected to sell 100,000 personal computers before the end of 1984, and that the first quarter earnings in 1984 would be equal to those achieved in 1983. *Id.*, at 314. The plaintiff options traders claimed that these statements were material misrepresentations, since the corporation in fact experienced a sharp decline in earnings due to a drop in personal computer sales. *Id.*, at 312. The court held that the options holders had standing to sue for affirmative misrepresentations, because Rule 10b–5 applies to prohibited acts that occur in connection with the purchase or sale of "any security," including options contracts. *Id.* at 315; *see supra* n. 7. The court distinguished *McDonnell Douglas* because that case was decided on the basis of nondisclosures by the corporation rather than affirmative misrepresentations, and held that "[t]he better rule is one that recognizes that options holders have standing to sue for affirmative misrepresentations." *In re Digital Equipment*, at 315. *See also Backman v. Polaroid Corporation*, 540

9. TI disputes this characterization of the facts in *McDonnell Douglas* and has submitted the complaint from that case. The plaintiffs alleged there that the corporate defendant not only failed to disclose material facts, but also issued favorable earnings reports predicting bright future prospects. Reply Memorandum in Support of Texas Instruments' Motion to Dismiss or Transfer, at 3–4, Exh. A. The district court opinion in the case does not fully set out the facts, and simply states that plaintiffs claim that "the defendants failed to disclose to the investing public certain material adverse information...." *McDonnell Douglas Corp.*, 567 F.Supp. at 126. However, our own decision does not turn on the scope of the *McDonnell Douglas* holding.

F.Supp. 667, 671 (D.Mass.1982); *Lloyd v. Industrial Bio-test Laboratories, Inc.*, 454 F.Supp. 807 (S.D.N.Y.1978) (decided before *Chiarella* ).

We do not agree that the distinction between affirmative misrepresentation and nondisclosure calls for a different rule as to the standing of options traders to sue under § 10(b). Instead, we read *Chiarella* and its progeny as indicating that there must be some relationship, or some connection between the plaintiffs and the § 10(b) defendant. *Chiarella*, 445 U.S. at 228–30, 100 S.Ct. at 1114–16; *Dirks v. S.E.C.*, 463 U.S. at 657–58, 103 S.Ct. at 3262–63; *Laventhall*, 704 F.2d at 413–14; *cf. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 at 745–49, 95 S.Ct. 1917, 1929–32, 44 L.Ed.2d 539; *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94–95 (2d Cir.1981). Indeed, Rule 10b–5 itself only prohibits those deceptive acts which occur "in connection with the purchase or sale of any security." *See also* § 10(b), *supra* n. 6. Although the "in connection with" requirement has been broadly interpreted in order to facilitate the remedial purposes of the securities laws, *see S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 858–61 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), it is still necessary to establish some nexus between the defendant's actions and the plaintiff's injuries. Where the corporate defendant has acted by releasing misleading or false statements to the public, the "in connection with" element is satisfied if the statements were "of a sort that would cause reasonable investors to rely thereon, and in connection therewith, so relying, cause them to purchase or sell .a corporation's securities." *Id.*, at 860; *see also Teamsters Local 282 Pension Fund v. Angelos*, 762 F.2d 522, 528–29 (7th Cir. 1985). Options traders, however, are not investors in the corporation making misleading statements, nor do they purchase or sell that corporation's securities. Their transactions in options contracts are simply too remote to satisfy the "in connection with" requirement when the alleged deceptive acts are merely corporate misstate-ments not directed in any way to the options market.

We recognize that the question of options traders' standing to sue for corporate misrepresentations is a close and unsettled one. The underlying goal of the securities laws is to ensure the integrity of the open securities market by protecting its participants from deceptive and misleading information. The options market is to a certain extent based on the fortunes and failures of the corporations issuing common stock, so to that extent the options trader relies on information concerning the business outlook for those corporations and may be misled when that information is in error. However, an options contract is also recognized as a riskier investment than a transaction on the common stock market; the options trader makes the decision to assume greater risk in order to garner greater returns. We do not feel obligated to expand the scope of liability under § 10(b) to make this obviously uncertain market safer for the trader who has no connection whatsoever to the issuer of the underlying stock. We are mindful that if plaintiffs were to succeed in this cause of action, their compensation would be paid by the corporation, and ultimately by the shareholders and investors in common stock. Moreover, TI points out that it does not control the number of options contracts that may be written; its potential liability to options holders is limited only by the whims of the options writers. In addition, we are confident that whatever deterrent purpose is served by § 10(b) and Rule 10b–5 will be amply fulfilled by restricting liability for misrepresentations and omissions to persons trading in the common stock of a corporation.

Therefore, TI's motion to dismiss those claims under Count I based on options transactions is granted. The claims based on long purchases of TI stock remain, as the complaint sufficiently alleges that those purchases were made in reliance on TI's statements as to its financial condition, and a duty to disclose existed between TI and the buyers of its common stock.

### Aiding and Abetting

Plaintiff options traders also allege that TI is secondarily liable to them for aiding and abetting the securities violations committed by the individual defendants who traded unlawfully in TI options. *See infra* at 163–164. TI argues that these claims must be dismissed because they are conclusory and fail to meet the requirements of Federal Rule of Civil Procedure 9(b).

Three elements are necessary to establish liability for aiding and abetting under the securities laws: (1) there must be an independent primary fraud; (2) the aider and abettor knew of or recklessly disregarded the possibility of the primary fraud; and (3) the aider and abettor must have given substantial assistance to the persons committing the primary fraud. *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 791 (3d Cir.1982), *cert. denied,* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); *Morgan v. Prudential Group, Inc.,* 81 F.R.D. 418, 424 (S.D. N.Y.1978). Silence and inaction, as well as affirmative acts, may constitute "substantial assistance"; however, the aider and abettor must have actual knowledge of the primary fraud, or should have known of the fraud but for a breach of a duty to inquire. *Hochfelder v. Midwest Stock Exchange,* 503 F.2d 364, 374 (7th Cir.), *cert. denied,* 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974); *cf. Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793, 799–800 (3d Cir.1978) (inaction is a predicate for secondary liability only if the aider and abettor *"consciously* intended to assist in the perpetration of a wrongful act." (Emphasis in original). In addition, conclusory allegations will not support a claim of aiding and abetting; "unadorned allegations" of "participation" in an allegedly fraudulent scheme are insufficient to meet the particularity requirements of Rule 9(b). *Morgan,* 81 F.R.D. at 425; *see also Frischling v. Priest Oil and Gas Corp.,* 524 F.Supp. 1107, 1111 (N.D.Ill. 1981).

Plaintiffs argue that the complaint adequately alleges that TI substantially as-sisted the insider trading of the individual defendants by withholding the June 10, 1983, press statement until the close of trading that day in order to allow the individual defendants to complete their unlawful transactions. First Am.Comp., ¶ 32. We agree that these allegations go beyond alleging mere participation. However, since TI did not owe the plaintiff options traders any fiduciary duty, *see supra* at 159–162, plaintiffs must demonstrate that TI actually knew of the options trading by the individual defendants and delayed releasing the June 10 statements with the intent of assisting those defendants. *Hochfelder,* 503 F.2d at 374. It is not enough to show that TI knew that the delay "would allow" employees to trade on inside information, without establishing that in fact TI knew that such trading was going on. First Am.Comp., ¶ 32. *See Monsen,* 579 F.2d at 799 ("Knowledge of the underlying violation is a critical element in proof of aiding-abetting liability, for without this requirement financial institutions, brokerage houses, and other such organizations would be virtual insurers of their customers against security law violators.").

Plaintiffs have failed to allege any facts indicating that TI had actual knowledge of the fraudulent activity of the individual defendants. Plaintiffs simply make the conclusory statement that the June 10 press release was "withheld with the intent, knowledge or reckless disregard that the fraud of certain insiders and their associates ... would be aided and abetted by such refusal to disclose." First Am.Comp., ¶ 32. A bare legal conclusion without factual allegations to support it is insufficient to withstand a motion to dismiss. *Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648, 654 (7th Cir.1984) (antitrust complaint dismissed). The Seventh Circuit Court of Appeals has recently admonished that the liberal pleading standard articulated in *Conley v. Gibson, supra,* is not to be literally applied. Instead, the heavy costs of complex modern litigation and the burgeoning caseload of the federal courts indicate

that parties should not be allowed to proceed with discovery "if there is no reasonable prospect that the plaintiff can make out a cause of action from the events narrated in the complaint." *Id.* Therefore, plaintiffs must "set out sufficient factual matter to outline the elements of [their] cause of action or claim, proof of which is essential to [their] recovery." *Id., quoting Daves v. Hawaiian Dredging Co.,* 114 F.Supp. 643, 645 (D.Haw.1953) (Fair Labor Standards Act case); *see also Benson v. Cady,* 761 F.2d 335, 338 (7th Cir.1985) (prisoner civil rights case). Plaintiffs have not pled any factual matter to support their conclusion that TI had actual knowledge of the primary fraud in this case. Accordingly, the claims of the plaintiff options traders based on the secondary liability of TI are also dismissed. The claims of those plaintiffs purchasing TI stock remain, since the holding in *Hochfelder* indicates that a case of aiding and abetting may be based on a failure to act due to a breach of fiduciary duty. *See supra* at 162. Plaintiff options traders will be allowed to amend the complaint, if they can in good faith allege sufficient facts to support their allegation that TI acted with actual knowledge of the fraudulent activity of the individual defendants. *See* Fed.R.Civ.P. 11.

### Pendent State Claims

Having dismissed the federal securities law claims based on the options transactions, we will exercise our discretion under *United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966), and dismiss the pendent state fraud claims based on those transactions. The pendent claims against TI based on stock purchases remain.[10]

### Motions to Dismiss by Individual Defendants

All of the individual defendants have also moved to dismiss the claims of the plaintiff options traders on the basis that options traders have no standing to sue for violations of Rule 10b–5. Defendants argue that, like the defendant in *Chiarella,* they were strangers to plaintiffs and had no fiduciary obligation to persons trading in TI options. *See Chiarella v. United States,* 445 U.S. at 232–33, 100 S.Ct. at 1116–17; *supra* at 159.

However, unlike the defendant in *Chiarella,* the individual defendants in this case were employees of TI or were tippees of employees. As such they were corporate insiders, who, by virtue of their fiduciary duty to their employer and its shareholders, were subject to a separate duty to abstain from trading or disclose inside information. Because the securities laws are designed to protect the entire open market, *see supra* at 161, this duty is owed not only to the shareholders of the corporate

---

**10.** We are, however, skeptical as to whether the amended complaint in fact states a claim under Illinois law for common law fraud. The alleged misrepresentations contained in the March and April statements as to the prospects for TI in 1983 seem to be predictions of future occurrences or mere expressions of opinion, neither of which are considered fraudulent under Illinois law. *Carter v. Mueller,* 120 Ill.App.3d 314, 320, 75 Ill.Dec. 776, 781–82, 457 N.E.2d 1335, 1340–41 (1st Dist.1983); *Metropolitan Bank & Trust Co. v. Oliver,* 4 Ill.App.3d 975, 283 N.E.2d 62, 64 (1st Dist.1972). *See also Duhl v. Nash Realty, Inc.,* 102 Ill.App.3d 483, 489–91, 57 Ill.Dec. 904, 909–11, 429 N.E.2d 1267, 1272–74 (1st Dist.1982) (although opinions are generally not actionable, where they involve the value of an item for sale and are made as statements of fact for the buyer to rely on, they may give rise to a claim for fraud). Omissions or the concealment of existing facts may be tortious when they occur with the intent to deceive and under circumstances creating the opportunity and duty to speak. *Perlman v. Time, Inc.,* 64 Ill.App.3d 190, 195, 20 Ill.Dec. 831, 835, 380 N.E.2d 1040, 1044 (1st Dist.1978). The plaintiffs who purchased stock may be able to demonstrate that TI fraudulently concealed information concerning the decline in its home computer market, because it had a duty to purchasers of common stock to speak. We are not convinced, however, that the same duty to reveal information existed as to options traders. *See supra* at 159–62. Although the question was not addressed by the parties, it may also be determined that Texas law applies. *See Pittway Corp. v. Lockheed Aircraft Corp.,* 641 F.2d 524, 526–27 & n. 1 (7th Cir.1981) (explaining Illinois' use of the most significant relationship test contained in the *Restatement (Second) of Conflict of Laws* ). We leave it to the transferee court in this case to determine the proper application of either Illinois or Texas law. *See infra* at 166.

employer, but also to the investing public at large. *O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1187 (S.D.N.Y.1981). The transactional nexus required under the rule between plaintiffs and defendants exists by virtue of the fact that corporate insider defendants who choose to buy or sell options are trading contemporaneously in the same market with the plaintiff options traders. *Id.,* at 1188; *see also Laventhall,* 704 F.2d at 412; *supra* at 159. Defendants had the advantage over plaintiffs of knowing in advance of TI's home computer downfall, and used that advantage to plaintiffs' detriment. In contrast, TI took no actions that *directly* affected the options market, and accordingly, no transactional nexus existed. *See supra* at 161–162. Therefore, although we find that plaintiffs do not have standing to assert claims against TI based on options transactions, plaintiffs do have standing to assert their claims against the individual defendants, all of whom actively participated in the options market at the same time as plaintiffs. The motions to dismiss of the individual defendants are denied.[11]

■ As for defendant Emery Spears' motion for summary judgment, Spears has failed to demonstrate that there is no genuine issue as to any material fact. Fed.R. Civ.P. 56(c). Indeed, his affidavit denying that he possessed any material inside information simply creates a fact question to be determined at trial in the face of plaintiffs' allegation to the contrary. First Am.

Comp., ¶ 11. Spears' motion for summary judgment is denied.

**Motions to Transfer**

All of the defendants, including TI, have moved under 28 U.S.C. § 1404(a) to transfer this action to the Northern District of Texas, for the convenience of the parties and witnesses, and in the interest of justice. The defendants argue that all of the witnesses with knowledge of the facts involving the insider information concerning TI's financial condition reside in Texas; the vast majority of relevant documents, involving hundreds of thousands of pages, are located in Texas; and there are already two suits, a civil class action and an SEC enforcement action involving the same facts and defendants, pending in Texas. In addition, the individual defendants maintain that they are not financially able to assume the costs involved in simultaneously defending lawsuits in two jurisdictions. Defendant Fox also informs us that he is in ill health, and that the strain of having to travel to Chicago for proceedings in this court would jeopardize his physical condition.

■ We have recently set forth the various factors we must consider in determining whether to transfer a case under § 1404(a). *Communications Associates, Inc. v. Novatel Communications, Inc.,* No. 84 C 6076, slip op. at 3–7 (N.D.Ill. March 1, 1985) (Grady, J.). Defendants bear the burden of demonstrating that there is a "clear balance" of inconvenience to defend-

---

**11.** In addition to the motions to dismiss based on standing, defendants Ball, Fleece and Fox have moved to dismiss the complaint for improper venue under 28 U.S.C. § 1391(b) because this is not the district where plaintiffs' claims arose. Venue in this case, however, is governed by the more liberal venue provision of the 1934 Act, which provides that securities actions may be brought in "the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. The allegedly unlawful options transactions through which plaintiffs were injured and defendants profited all took place on the CBOE, here in Chicago. *Blau v. Lamb,* 242 F.Supp. 151, 159–60 (S.D.N.Y.1965), *aff'd in relevant part and rev'd in part,* 363 F.2d 507 (2d Cir.1966) (venue proper in New York because unlawful common stock transactions took place on the American Stock Exchange, located in New York). The motions by Ball, Fleece and Fox based on improper venue are utterly without merit.

In addition, we are not persuaded by defendants' argument that plaintiffs' fraud claims against the individual defendants are insufficient under Rule 9(b). The complaint clearly alleges the insider information defendants allegedly possessed, and sets forth in detail the transactions in which each of the engaged on the options market. These allegations are sufficient to notify defendants of the nature of plaintiffs' claims, and stand in marked contrast to the more conclusory allegations made against TI.

ants in order to justify transfer of the case, and in the absence of such a clear difference, plaintiffs' choice of forum should not be disturbed. *Id.*, at 3; *NTN Bearing Corp. v. Charles E. Scott, Inc.*, 557 F.Supp. 1273 (N.D.Ill.1983). This is especially true where plaintiffs are residents of the chosen forum. *Communications Associates,* slip op. at 4; *Magnavox Co. v. Bally Manufacturing Co.*, 414 F.Supp. 891, 892 (N.D.Ill.1976). Plaintiffs' choice is insignificant only if the chosen forum lacks any significant contact with the cause of action. *Communications Associates,* slip op. at 4; *Hotel Constructors, Inc. v. Seagrave Corp.*, 543 F.Supp. 1048, 1050 (N.D.Ill. 1982).

■ In this case, all but one of the plaintiffs reside in this district. Defendants attempt to diminish the significance of this fact by arguing that this district lacks any significant contact with the case because all of defendants' actions in issuing misleading statements, failing to disclose material information, and acquiring insider information occurred in Texas. Defendants overlook the fact that the allegedly illegal securities transactions actually took place in this district, on the CBOE, and that this district has a significant interest in ensuring that the options market located here is free from fraud. We therefore give plaintiffs' choice of this forum considerable weight.

Nevertheless, plaintiffs' choice may be overcome if the convenience of witnesses, convenience of the parties and the interests of justice point to the Northern District of Texas as the preferable jurisdiction. Defendants claim that all of the material witnesses in this case reside in Texas, with the exception of plaintiffs and whatever experts are necessary to testify as to the nature of the options market. Defendants maintain that the crucial issue in this case is the allegedly fraudulent scheme carried out in Texas to withhold material inside information in order to profit from that

information on the stock market and options market. All of the witnesses and documents concerning this scheme are located in Texas, and the individual defendants in particular make the point that the live testimony, as opposed to deposition testimony, of these witnesses is critical, as the determination of this case at trial is likely to revolve around questions of credibility. In evaluating the convenience of witness factor, however, we must take into account the parties' control over witnesses. *Communications Associates, Inc. v. Novatel Communications, supra,* slip op. at 5; *Associated Mills, Inc. v. Rush-Hampton Industries,* 588 F.Supp. 1164, 1167 (N.D.Ill. 1984). Most of the necessary witnesses from Texas are either defendants in this case or are employees of TI, and are subject to TI's control. Since TI is still a defendant in this case, it should be able to produce its employees as witnesses here in Chicago, even though the individual defendants would not have been able to do so. The only witnesses who may be unavailable for trial may be the options brokers in Texas through whom certain defendants made their options purchases. *See, e.g.,* Motion to Dismiss or for Transfer, Affidavit of P. Joanne Randall, ¶ 3. These brokers would not be subject to the compulsory process of this court.[12] We note, however, that it is difficult to predict at this early stage of the litigation exactly which witnesses will prove to be necessary, or desirable, to call at trial. *Cf. Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 907 (S.D.N.Y.1983). As for defendants' argument concerning the location of relevant documents, we do not believe that this is a compelling factor, given the ready availability of photocopying and the relative ease with which documents may be selectively shipped around the country. *See American Standard, Inc. v. Bendix Corp.*, 487 F.Supp. 254, 264 (W.D.Mo.1980).

We are concerned, however, by the apparent imbalance in the convenience of the

**12.** It may be, however, that these brokers will become party defendants in the case, *see supra* n. 3, and will then, of course, be present at trial.

parties. Plaintiffs argue that transfer of this case to Texas will simply shift the inconvenience from defendants to plaintiffs, and therefore this factor does not outweigh the consideration accorded plaintiffs' choice of forum. *See Communications Associates,* slip op. at 6; *Ronco, Inc. v. Plastics, Inc.,* 539 F.Supp. 391, 401–02 (N.D.Ill.1982). But there is more than just a shift of equally inconvenient circumstances here. The individual defendants point out that they are already defending the SEC enforcement action in Texas and would be required to obtain additional Chicago counsel if this case were to remain here.[13] All have stated that this would place undue financial hardship on them, and some of the defendants have indicated that they are persons of very modest financial means. On the other hand, if this case were moved to Texas, plaintiffs would have to obtain local counsel; however, as plaintiffs are all represented by one set of attorneys, a transfer will only result in duplication of that one set of attorneys, rather than duplication of six sets.[14]

In addition, defendants contend that transfer of the case is in the interest of judicial economy, as there is a civil action as well as the SEC action pending in Texas, and the Texas court is familiar with the events in question. The civil action, however, has apparently concluded with a settlement between the parties, and as a result, we are not convinced that judicial economy would necessarily be served by moving this case. We will, however, grant defendants' motion for a transfer because of our concern for the ability of the individual defendants to defend adequately two lawsuits simultaneously in two such disparate locales. Justice will not be served by forcing these individuals to shoulder attorneys' fees and costs for duplicative work, or to forego a vigorous defense in one case or the other due to a lack of resources. These concerns would not outweigh plaintiffs' decision to litigate here if the only defendant in the case were TI or other defendants capable of handling the financial burden of simultaneous suits. Certain individual defendants have made it clear, however, that it would be an undue hardship for them. Defendants' motions to transfer this case to the Northern District of Texas are therefore granted.

## CONCLUSION

Defendant Texas Instrument's motion to dismiss the complaint is granted only as to the claims based on options transactions. The motions to dismiss by each of the individual defendants are denied. Plaintiffs may have until November 22, 1985, to amend their complaint if they can in good faith allege facts to support a claim against TI for aiding and abetting. The motions to transfer this action to the Northern District of Texas are granted.

---

**13.** *See, e.g.,* Affidavit of P. Joanne Randall, ¶ 4; Affidavit of David L. Ball Submitted in Support of Defendant's Motion to Transfer, ¶¶ 8–9; Affidavit of Joseph C. Fox Submitted in Support of His Motion for Transfer, ¶¶ 8–9. We would take a very different view of this question if it appeared that defendants' Texas counsel were going to take the laboring oar in this court and that local counsel were going to be retained simply for the purpose of accepting notice of motions and handling routine matters. In that event, the cost of local counsel here would be minimal.

**14.** Implicit in defendants' argument is the representation that this case will be handled in Texas by the same attorneys who are already representing defendants there on the SEC case, and that a substantial saving of time and expense will therefore be effected by the transfer. If this is not the situation, and defendants are going to be represented in this case by attorneys other than those already familiar with the factual and legal issues by virtue of their work in the other Texas cases, that fact should be brought to our attention on a motion to reconsider the transfer order.