**Mohammad IDREES, Plaintiff,**

v.

**AMERICAN UNIVERSITY OF THE CARIBBEAN, Defendant.**

**No. 80 Civ. 6629 (DNE).**

United States District Court, S. D. New York.

Sept. 17, 1982.

Richard Pikna, New York City, for plaintiff.

Danziger, Bangser, Klipstein, Goldsmith & Greenwald, New York City, for defendant; Jonathan J. Fink, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDELSTEIN, District Judge:

This is an action for damages resulting from certain alleged misrepresentations contained in a bulletin distributed by defendant American University of the Caribbean ("AUC") to plaintiff Mohammad Idrees ("Idrees") and other prospective students which Idrees claims falsely describes AUC's course of study, faculty, and facilities for its School of Medicine. The court has jurisdiction pursuant to 28 U.S.C. § 1332.

## FACTUAL BACKGROUND

AUC is a not-for-profit corporation organized in January 1978 under the laws of

the British Crown Colony of Montserrat, British West Indies. The University's first class of instruction commenced on August 14, 1978, at a temporary campus in Cincinnati, Ohio. AUC moved to its present campus in Montserrat in January, 1980. In addition to its Montserrat campus, AUC maintains offices in Miami and Taiwan. The Miami office processes applications and requests for information, and transmits correspondence between Montserrat and the United States. The Miami office operates as well as an office for AUC's Dean of Clinical Studies.

The University consists of two schools, the School of Medicine ("the school") and the School of Graduate Studies. At the time of trial, 470 students were enrolled in and 270 had just been graduated from the school. The campus occupies twenty-five acres in Montserrat and includes thirteen buildings constructed from 1978 to 1980.[1] The school employs approximately 130 staff and faculty personnel.

From January 7, 1979 to January 25, 1981 AUC placed the following advertisement in the *New York Times:*[2]

STUDY MEDICINE

At an English speaking foreign medical school near the U.S.A.

The American University of the Carribean [sic]—School of Medicine—is located on Montserrat in the British West Indies. Listed by the World Health Organization. Courses taught by U.S. educators. Offers M.D. program on a tri-semester system. Completion in 2 years and 9 months.

To apply, contact U.S. office [the Miami office address and telephone number was then listed].

Idrees resides in New York City and is an American citizen of Pakistani origin, who came to the United States in 1972. He was employed as a laboratory technician at Beth Israel Medical Center ("Beth Israel") in New York City from November 11, 1972 to May 9, 1980.

In late 1979 or January 1980, Idrees saw AUC's advertisement in the *New York Times* and requested a copy of AUC's Bulletin and admissions materials from the AUC Miami office.[3] Idrees received the materials in January, 1980, and on approximately January 31, sent his completed application for the May, 1980 semester and an application fee of $50.00 to AUC's Miami office.[4] The Miami office received the application on February 4 and transmitted it to Mont-

---

1. The campus consists of approximately 225,-000 square feet of floor space, including eight dormitory buildings, a dining hall and a kitchen, an administration building, a laundry and support services building, and two medical science buildings containing lecture, laboratory and library facilities.

2. The parties stipulated that during this time period, AUC placed this advertisement in the *New York Times* on sixteen dates.

3. AUC contends that Idrees' decision to apply to AUC's medical school was based on several conversations that Idrees had with a friend, Shafat Khan ("Khan"), rather than on any representations made by AUC. Idrees became friendly with Kahn at Beth Israel where the latter was employed from 1974 to 1978. In August, 1979, Kahn enrolled in AUC, and later Kahn and Idrees were roommates during Idrees' enrollment at AUC. Kahn testified that he returned to New York in late December, 1979, during AUC's semester break and spoke to Idrees on three occasions concerning the

school. Kahn stated that he told Idrees that AUC was in the process of moving to its new campus, and that while the library and many of the facilities and other aspects of the school were far from perfect, overall he was satisfied with the school.

Idrees denies that Kahn made these statements to him, and suggests as a motive for bias on Kahn's part, that when they were roommates at AUC, he had refused Kahn's request for a loan. Idrees called as a rebuttal witness Peraez Mirza, a fellow employee of Idrees' and Kahn's, who testified that Kahn had sought this loan from Idrees.

4. In addition, Idrees spoke to AUC representatives in the Miami office on several occasions between January and May, 1980 concerning the program at AUC. For example, on one of these occasions a woman at the AUC office advised Idrees that the AUC curriculum involved four semesters of study in Montserrat and four semesters in the United States.

serrat for review by the Admissions Committee. Idrees' application was accepted on March 4, and a notification of formal acceptance and bulletin of new student information was sent to Idrees from the Miami office on March 12. On March 18, Idrees paid to AUC an "inscription fee" of $450.00 thereby confirming his enrollment in the May semester.

After having been denied an educational leave of absence, Idrees resigned from his position with Beth Israel as of May 9. Idrees arrived in Montserrat on May 10, paid his tuition fee of $3,005.00 to AUC's registrar's office on May 12, and commenced classes at AUC on May 14.

Shortly thereafter, and as Idrees states in his amended complaint, he allegedly discovered that AUC had falsely represented that:

1. [T]he school had a library with periodicals, books and audio-visual aids. These representations were false as the library in fact had no periodicals, books or audio-visual aids. (¶ 3.);

2. [The school] had laboratory facilities that included microscopes, microscopic slides and skeletons. These representations were false as there were no microscopes, microscopic slides or skeletons in the laboratory. (¶ 4.);

3. [F]or the class in histology [each student] would be provided with a set of prepared slides and a microscope. These representations were false as he was not provided with said slides or microscope. (¶ 5.);

4. Defendant in [its bulletin] published a photograph identified as the Montserrat Hospital calculated to give plaintiff the impression that the hospital and the school had a relationship that would enable plaintiff and other students to use the facilities of said hospital. Plaintiff was in fact deceived by the publication of said photograph inasmuch as neither he nor other students were able to use any of the facilities of the hospital. (¶ 6.);

5. [A] semester would consist of four classes commencing May 14, 1980. Such representation was false as only two classes started on that date. Defendant represented that the laboratory class would start on May 14, 1980. Such representation was false as such class did not start until June 10, 1982. (¶ 7.);

6. The number of faculty members at the school was less than one-half of the number represented by defendant. The courses in fact given were worthless and one was taught by a student enrolled at the school at that time. (¶ 7.).

Idrees withdrew from the school on June 11, and returned to New York on June 15. AUC; pursuant to its stated policy in its bulletin, refused Idrees' request for a refund of his tuition.[5] Upon returning to New York, Idrees was unable to obtain a position with his former employer and did not secure employment until September 8, when he began work as a laboratory technician at St. Luke's-Roosevelt Hospital Center.[6]

Idrees commenced this action on November 21, 1980 by the filing of a summons and

**5.** AUC's bulletin states at page 16:
Students officially withdrawing from the school will be credited for the tuition in accordance with the following schedule from the date instruction begins:
1st week after classes start-75% of the tuition refunded
2nd week after classes start-50% of the tuition refunded
3rd week after classes start-25% of the tuition refunded
After the 3rd week no tuition will be refunded.

**6.** Idrees' offered proof that his annual salary at St. Luke's is $1,568.43 less than his salary at his previous position at Beth Israel. Thus, as an element of his claim for special damages, Idrees has alleged damages of $6,769.64, the difference in his salary at St. Luke's compared to that at Beth Israel from the date he started working at St. Luke's to the date the trial commenced (November 20, 1981). Idrees claims this difference was caused by AUC's misrepresentations, insofar as he was forced to except a lower salary after leaving AUC.

complaint.[7] Idrees seeks compensatory damages in the amount of $16,769.11 for the tuition and fees paid to AUC, his air fare to and from Montserrat, and lost wages resulting from his inability to return to his position at Beth Israel. In addition, Idrees seeks punitive damages of $1,000,000.

## DISCUSSION

Since this is a diversity action, New York law supplies the substantive rules of law. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under New York common law, the following elements must be established to sustain an action for fraudulent misrepresentation:

1. misrepresentation, concealment or nondisclosure of a material fact;

2. intent to deceive on the part of the defendant;

3. justifiable reliance upon the misrepresentation by the plaintiff; and

4. injury to the plaintiff as a result of such reliance.

*Cullen v. BMW of North America, Inc.,* 490 F.Supp. 249, 254 (E.D.N.Y.1980); *Van Alen v. Dominick & Dominick, Inc.,* 441 F.Supp. 389, 402–03 (S.D.N.Y.1976), *aff'd,* 560 F.2d 547 (2d Cir. 1977); *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 406–07, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 836 (1958).

It is well established that plaintiff has the burden of proving fraud by clear and convincing evidence. *Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 186 (2d Cir. 1977); *Van Alen v. Dominick & Dominick, Inc., supra;*

*Simcuski v. Saeli,* 44 N.Y.2d 442, 452, 406 N.Y.S.2d 259, 265, 377 N.E.2d 713, 719 (1978). Thus, for Idrees to prevail, he must prove each of the four elements of fraud—falsity, scienter, reliance and damage—by clear and convincing evidence. The court will now address each of the alleged misrepresentations made by AUC.

### A. Library

Idrees alleges that AUC falsely represented that the school had a library with periodicals, books and audio-visual aids. The AUC bulletin at page 16 states as follows:

> Library—
>
> Periodicals, books, and audio-visual aids are important supplements to medical studies. Students are encouraged to take full advantage of the available facilities.

Idrees testified that the "library" was a room containing desks and chairs, but no books, periodicals, audio-visual equipment, or shelves. He further stated that there was no librarian or other person in charge of this room. Idrees asserts that he relied on AUC's representations in its bulletin concerning its library in deciding to enroll in its school and that as a result of his justifiable reliance he sustained damages.

AUC's President, Dr. Paul Tien ("Tien"),[8] and AUC's Dean of Pre-Clinical Studies and a professor of anatomy, Dr. Gino DiVirgilio ("DiVirgilio"), conceded that during the period when Idrees attended the school, there was no library. Tien and DiVirgilio stated that the school's books, although in shipping containers, were available to students upon request at the AUC business office. In

---

**7.** On February 20, 1981, AUC moved pursuant to Fed.R.Civ.P. 12(b) to dismiss the complaint for lack of personal jurisdiction, on grounds of *forum non conveniens,* and, alternatively, to transfer this action pursuant to 28 U.S.C. § 1404(a). By Order dated June 8, 1981, this court, by the Honorable Leonard B. Sand, granted the motion to dismiss on jurisdictional grounds. The court, however, also granted Idrees leave to amend his complaint to replead the jurisdictional allegations. The court denied the remaining bases of AUC's motion, but it conditioned such denial by limiting the scope of Idrees' discovery and the number of witnesses who could testify at trial.

On June 19, 1981, Idrees filed his amended complaint. AUC never renewed its motion to dismiss for lack of personal jurisdiction, and its papers are silent on this issue. Thus, AUC appears to have conceded jurisdiction.

**8.** Dr. Tien is not a physician and has no medical training.

addition, DiVirgilio testified that his personal library was available to students. Tien explained that because of construction delays, the physical structure of the library was not completed until two weeks before the May, 1980 semester commenced. Tien further testified that AUC elected to delay shelving its books until a librarian could be hired, and that finally in August, 1980, having had no success in hiring a librarian, the decision was made to remove the books from the shipping containers and shelve them.

## B.  Microscopes and Skeletons

Idrees asserts that AUC falsely claimed that the school's facilities included microscopes, microscopic slides and skeletons for use during laboratory sessions. The bulletin states at page 16: "There are no fees charged for any equipment used in the laboratories. These include the microscope, microscope slides, and skeletons." Both Idrees and Masroor Khan, a student who attended and left the school at approximately the same time as Idrees, testified that during the four weeks they were enrolled in the school they were not provided with any of this equipment. They also stated that to their knowledge no such equipment was supplied to other students. Idrees further testified that the laboratory facilities consisted of a room with three or four tables and no equipment.

AUC contends that Idrees failed to prove that AUC never possessed this equipment. AUC introduced into evidence invoices and checks relating to the lease or purchase of microscopes. Further, on cross-examination of Idrees and Masroor Khan, AUC elicited concessions from both that they each had only attended one laboratory session. Thus, AUC argues that Idrees and Mr. Khan did not see the laboratory equipment, which was kept in locked cabinets in the laboratories.

## C.  Microscopes and Prepared Slides for Histology Class

Another allegation of Idrees' amended complaint is that AUC falsely represented that students would be provided with a set of prepared slides and a microscope in connection with the class in histology. The AUC bulletin states at page 9: "Each student is provided with a set of prepared slides and microscope." Idrees testified that during the first laboratory session in histology neither prepared slides nor microscopes were furnished to him or to any other students. In place of this equipment, the school used projection slides, which Idrees claims is an inferior teaching device.

AUC countered Idrees' testimony with that of DiVirgilio who testified that prepared microscope slides are not appropriate for every laboratory session, and that in some circumstances projection slides may be a superior method of viewing microscopic detail. AUC also argues that Idrees merely stated that microscopes and prepared slides were not made available to students attending the first histology laboratory class. Thus, AUC asserts that Idrees has not proved that such equipment was not supplied during subsequent classes.

## D.  Relationship to Montserrat Hospital

Idrees claims that AUC deliberately included a photograph labelled "Montserrat Hospital" in its bulletin to mislead prospective students into believing that the school had a relationship with the hospital enabling the students to use the hospital's facilities. Idrees stated that he believed that such a relationship between the school and the hospital existed. AUC responds that it never represented that such a relationship existed, and that any inference from the bulletin that such relationship existed was mere speculation on the part of Idrees. AUC asserts that Idrees has failed to prove that such representation was made or that AUC intended to invite such speculation on the part of prospective students. Tien claimed that the photograph of the hospital was one of five photographs included in the bulletin merely for decorative purposes, depicting examples of some of the island's scenery.

### E. Commencement of Classes on May 14, 1980

Idrees maintains that AUC falsely represented that May, 1980 semester would consist of four classes and would commence on May 14, 1980. Idrees testified that two of the classes began on May 14, but that when he left the school in mid-June one of the classes had still not begun. In addition, he testified that the Gross Anatomy I course was replaced by Gross Anatomy II. Thus, Idrees claims that AUC materially misrepresented the content and timing of the first semester courses and that he justifiably relied upon these misrepresentations and was injured thereby insofar as it jeopardized his completion of the M.D. program in the scheduled two years and nine months. Idrees maintained that the relative shortness of the school's M.D. program was a significant factor in his decision to enroll at AUC.

AUC contends that it never represented when the classes for the May, 1980 semester would commence. AUC contradicted Idrees' assertion that the replacement of Gross Anatomy I with Gross Anatomy II was improper in any way. DiVigilio testified that the sequence of the two courses is immaterial, as one is not a prerequisite for the other. The course labels merely indicate that the courses cover different regions of the body. AUC further argues that Idrees has failed to demonstrate how any alleged misrepresentations concerning the timing of the commencement of courses damaged him in any way.

### F. Size of Faculty and Quality of Education

Idrees alleges that AUC falsely represented the size of the faculty and the quality of the education offered. Idrees testified that of the twenty faculty members listed in AUC's 1980–1981 bulletin, only eleven were at the school in May, 1980. As indicated by the testimony of DiVigilio, AUC was aware several months before the commencement of the May, 1980 semester that many of the professors listed in its bulletin would not be teaching that semester.[9] AUC made no effort to advise the entering students of the substantial change in the composition of its faculty or of the names of replacements so that students could make an informed decision as to whether to attend the school or request a refund of their tuition. In addition, Idrees claims, and DiVigilio corroborated, that a first semester student was retained by AUC to teach the laboratory course in Anatomy. Idrees cites this as support for his claim that the quality of the school's instruction was inferior to that offered by other medical schools.

AUC responds by contending that at the time the bulletin was prepared, the faculty listing was accurate. Thus, AUC argues, that at most it was negligent, but that Idrees has tendered no proof that AUC intended to deceive potential students. Further, AUC says that by his own admission Idrees could not have relied on the faculty listing in the bulletin in deciding to enroll at AUC as he testified that prior to his arrival in Montserrat he knew nothing about the school's professors. Finally, AUC says that Idrees presented no evidence that the professors were unqualified or that the instruction was inferior. According to AUC, the first year student who taught the Anatomy laboratory course had a Ph.D. and was qualified to teach that course.

### G. Analysis of Idrees' Claims

The court finds that Idrees has adequately met his burden of proving by clear and

---

**9.** DiVigilio testified that in December, 1979 AUC knew that professors Andrew Szabo, Syed Hussaini, Russell Savage, and Thomas J. O'Callaghan had decided not to teach at the school. AUC learned in January, 1980 that professor Harry Shirkey had decided, for health reasons, not to teach at AUC, and AUC also learned sometime in early, 1980 that professor Ralph Walker was taking leave and would not be teaching at AUC in May, 1980. In March, 1980 AUC terminated the contract of professor Robert Winters, and in April, 1980 it terminated professor Michael Willinsky's contract. AUC was also advised in April, 1980 that professor Felix Lectura had resigned.

convincing evidence that AUC materially misrepresented the facilities and faculty of its school. The court finds that Idrees' testimony that he relied upon AUC's statements in its bulletin concerning the library facilities, laboratory equipment, faculty listings and AUC's affiliation with Montserrat Hospital is credible and that AUC failed to demonstrate at trial that the representations were accurate. Finally, the court finds that although AUC presented explanations for most of its alleged misrepresentations, AUC's conduct, taken as a whole, evidences an intent to create a false impression concerning the education offered at its school. *See Stad v. Grace Downs Model and Air Career School,* 65 Misc.2d 1095, 1099, 319 N.Y.S.2d 918, 921–22 (Civ.Ct.N.Y., 1971) (representations in defendant's advertisement and brochure taken as a whole mislead plaintiff concerning the services provided by defendant's school).

The thrust of AUC's defense, as presented by its President Dr. Tien, is that when AUC prepared its bulletin, in November, 1979, the information it contained was accurate. According to AUC, subsequent developments beyond their control—such as construction delays, and faculty defections—rendered some of that information inaccurate. AUC failed to explain why no steps were taken to advise the incoming students of these changed circumstances. Similarly, AUC has not explained why, in light of these changed circumstances, it refused to honor requests for refunds of tuition when such circumstances became known to students. As a result of these changes, AUC's ability to provide the services it had represented was severely compromised, and it appears that the educational needs of its students could not satisfactorily be met.

■ The court believes that AUC had a duty to inform its students of major changes which could affect their decision to attend its school. As stated in *Fischer v. Kletz,* 266 F.Supp. 180, 188 (S.D.N.Y.1967):

The common law has long required that a person who has made a representation must correct that representation if it becomes false and if he knows people are relying on it. This duty to disclose is imposed regardless of the interest of defendant in the representation and subsequent nondisclosure.

Failure of a party to disclose detrimental changes in an earlier made representation is concealment, *see Peerless Mills, Inc. v. American Tel. & Tel. Co.,* 527 F.2d 445, 449 (2d Cir. 1975); *Monier v. Guaranty Trust Co. of New York,* 82 F.2d 252, 254–55 (2d Cir. 1936), and tantamount to a fraudulent representation, *see Hong Kong Export Credit Insurance Corp. v. Dun & Bradstreet,* 414 F.Supp. 153, 158 (S.D.N.Y.1975); *Schumaker v. Mather,* 133 N.Y. 590, 595–96, 30 N.E. 755 (1892); *Warren Brothers Co. v. New York State Thruway Authority,* 34 A.D.2d 97, 99, 309 N.Y.S.2d 450, 452 (App. Div. 3d Dept., 1970), *aff'd,* 34 N.Y.2d 770, 358 N.Y.S.2d 139, 314 N.E.2d 878 (1974). This is especially true as to matters which are peculiarly within the knowledge of the representor and upon which it knows the other party will rely. *See Rothmiller v. Stein,* 143 N.Y. 581, 590–91, 38 N.E. 718 (1894); *State by Lefkowitz v. ITM, Inc.,* 52 Misc.2d 39, 48, 275 N.Y.S.2d 303, 316 (Sup. Ct.N.Y., 1966). Thus, AUC was under a duty to disclose to Idrees the developments concerning the school that adversely affected the quality of the education. *Securities and Exchange Commission v. Great American Industries, Inc.,* 407 F.2d 453, 461 (2d Cir. 1968), *cert. denied,* 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969).

■ Idrees has satisfied the court that AUC acted with the requisite scienter to sustain an action for fraud. The element of scienter includes false representations known to be untrue, or made with a reckless indifference to error, with the intent to cause the other party to act in reliance upon them. *See Ainger v. Michigan General Corp.,* 476 F.Supp. 1209, 1227–28 (S.D.N.Y. 1979), *aff'd,* 632 F.2d 1025 (2d Cir. 1980); *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250

N.E.2d 214, 218 (1969). AUC's failure to correct its earlier representations constitutes at least recklessness, if not actual concealment. This, coupled with AUC's deliberately misleading placement of the photograph of the Montserrat Hospital in its bulletin and its general lack of candor in describing its school of medicine, satisfies the court that AUC acted with intent to deceive prospective students. AUC's disingenuous explanation concerning the photograph of Montserrat Hospital lends support to Idrees' claim that AUC sought to intentionally deceive prospective students.

Idrees has adequately demonstrated that the representations made by AUC were material to his decision to attend its school and that he reasonably relied thereon. He has also established that as a result of these representations he has been injured.

▪ Under New York law, the measure of damages for an action in fraud is the actual pecuniary loss sustained as a result of the wrong. *Ainger v. Michigan General Corp., supra; Jones Memorial Trust v. TSAI Investment Services, Inc.,* 367 F.Supp. 491, 500 (S.D.N.Y.1973). The parties stipulated that Idrees' tuition, inscription fee, application fee and round-trip air fare between New York and Montserrat aggregated $3940.00.[10] The court finds that Idrees is entitled to an award of damages for these items.

▪ Idrees also seeks an award in the amount of $12,829.11 representing the damages he sustained because he was unable to resume his employment at Beth Israel. Idrees calculated this figure on the basis of four months of lost wages while he sought employment, and the differential between his present lower paying job and his job at Beth Israel. The court rejects this element of Idrees' claim for damages. It is well settled in New York that to be recoverable, the damages must be the direct result of the defendant's wrongful actions and must be independent of other causes. *Steitz v. Gifford,* 280 N.Y. 15, 20, 19 N.E.2d 661 (1939). The damages must be more than a merely speculative or conditional loss, and the plaintiff must demonstrate that they were proximately caused by the defendant's conduct. *Sands v. Abelli,* 290 F.Supp. 677, 681 (S.D.N.Y.1968).

Idrees' claim is that he left his job at Beth Israel as a result of AUC's representations, and that upon returning to New York, he was unable to obtain reinstatement at his former job or find another equally remunerative position. The record suggests that there were independent intervening causes as to why Idrees was denied reinstatement. Idrees testified that he had commenced a grievance proceeding against Beth Israel alleging that he was denied reinstatement on the basis of religious discrimination. Evidence was adduced indicating that Beth Israel did not consider Idrees to be a satisfactory employee and at one point had instituted a disciplinary proceeding against him. In addition, a letter from the Director of Personnel at Beth Israel to the New York City Commission on Human Rights states that Idrees never sought reinstatement. In sum, the court finds that this element of damages cannot be reasonably attributable to AUC's conduct and accordingly is denied. *See Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 803 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Bonime v. Doyle,* 416 F.Supp. 1372, 1383 (S.D.N.Y.1976), *aff'd,* 556 F.2d 554 (2d Cir.), *cert. denied,* 434 U.S. 924, 98 S.Ct. 401, 54 L.Ed.2d 281 (1977).

▪ Idrees also seeks an award of punitive damages in the amount of $1,000,-

---

10. Idrees' out-of-pocket expenses were as follows:

| | |
|---|---|
| Tuition | $3,005.00 |
| Inscription Fee | $ 450.00 |
| Application Fee | $ 50.00 |
| Air Fare | $ 435.00 |

In his amended complaint, Idrees alleged that he incurred $500.00 in damages in connection with purchasing books. At trial, however, he offered no proof concerning this item. Accordingly, the court deems that element of damages to have been abandoned.

000. In an action for fraud, punitive damages are recoverable where the defendant's conduct affects the public generally or involves a gross departure from moral behavior. *See Rosenberg v. GWV Travel, Inc.,* 480 F.Supp. 95, 96 (S.D.N.Y.1979); *Walker v. Sheldon,* 10 N.Y.2d 401, 404–06, 223 N.Y. S.2d 488, 490–92, 179 N.E.2d 497, 499–501 (1961). The court in *Walker v. Sheldon* stated:

> Punitive or exemplary damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others, who might otherwise be so prompted, from indulging in similar conduct in the future.

10 N.Y.2d at 405, 223 N.Y.S.2d at 490, 179 N.E.2d at 499. The acts complained of herein fall below that standard. While the actions of AUC are far from being laudatory, and indeed are reprehensible, the acts complained of do not rise to the level required by *Walker v. Sheldon, supra.* Accordingly, the court finds that punitive damages are inappropriate.[11]

### CONCLUSION

Idrees has sustained his burden of proof and is entitled to judgment and damages in the amount of $3940.00, with interest from May 12, 1980, costs in the amount of $372.81, and attorneys fees in the amount of $8,371.88.

The foregoing shall constitute the court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.

11. Pursuant to the court's ruling on January 4, 1982, costs in the amount of $109.28 are to be awarded to counsel for AUC and assessed against counsel for Idrees.