Sheldon STARKMAN, et al., Plaintiffs,

v.

WARNER COMMUNICATIONS, INC., et al., Defendants.

85 Civ. 7949 (JMW).

United States District Court,
S.D. New York.

Oct. 13, 1987.

Bader & Bader, White Plains, N.Y., for plaintiffs; I. Walton Bader, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Warner Communications Inc.; Leslie Gordon Fagen and C. William Phillips, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for individual defendants; Barry H. Garfinkel and Jeremy A. Berman, of counsel.

## MEMORANDUM AND ORDER

WALKER, District Judge:

### INTRODUCTION

This case presents the question, among others, of corporate and insider liability under the anti-fraud provision of the Securities and Exchange Act to those who trade in options to buy the corporation's stock.

Plaintiffs bring this action alleging violations of Section 10(b) of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. Section 78j(b), and Rule 10(b)(5) promulgated thereunder, 17 C.F.R. 240.-10(b)–5, violations of the Martin Act, specifically Sections 339–a and 352–c of the General Business Law of the State of New York (McKinney 1984), and common law fraud.

Plaintiffs are Sheldon and Donna Starkman (the "Starkmans"). Defendants are Warner Communications, Inc., a Delaware corporation ("Warner"), and various directors and officers of Warner (collectively, with Warner, the "defendants").

Plaintiffs allege that they purchased 500 warrants of Warner on or about May 17, 1982 at a price of $9,562 and that they

suffered a loss of approximately $460,000 on Warner call options they purchased and sold between August and November 1982, due to reliance upon material misrepresentations made by defendants to the public and, in Warner filings, to the SEC concerning the financial outlook for Warner. Though not stated in the complaint, in their memorandum of law opposing defendants' requests for partial summary judgment, plaintiffs allege that even in the absence of reliance on defendants' misstatements, plaintiffs are entitled to recover their options trading losses under a "fraud on the market theory."

Defendants bring this motion for partial summary judgment on the options claims pursuant to Fed.R.Civ.P. 56, asserting that, whatever the accuracy of defendants' statements and filings, any liability of defendants does not extend to Warner optionholders, to whom they owed no fiduciary duty, that, in any event, plaintiffs did not rely on defendants' statements or omissions, and that plaintiffs, who did not trade options with any of the defendants, could not possibly be the victims of fraud. Further, defendants assert that plaintiffs may not rely on a fraud on the market theory to seek recovery.

### Facts

#### A. *The Background of the Instant Litigation*

With this motion defendants seek to write the last chapter in a long story, the statements and transactions at issue having occurred over five years ago, and having already been the subject of much litigation.

In the early 1980's, Warner's profitability was greatly enhanced, in large part due to the explosive growth in the video game and cartridge industry, of which Warner's then wholly-owned subsidiary Atari, Inc. ("Atari") was an undisputed leader.

On December 8, 1982 the public learned that the good times for Warner were no longer so good. Warner announced that Atari's new sales were exceeded by cancellation of orders and that there would be a shortfall of expected profits. The Atari

disappointment, together with a $20 million write-off in connection with a Warner division, Knickerbocker Toy Company, Inc. ("Knickerbocker"), led to fourth quarter 1982 earnings for Warner that were approximately 50% less than 1981 fourth quarter earnings. Warner's fiscal 1982 earnings, as a result, "would be considerably less than previously represented to the investing public." *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 739 (S.D.N.Y.1985). The next day Warner stock dropped 16 points amid questions at Warner over who knew what, when did they know it, and why didn't they release it to the investing public? Soon thereafter, 18 class and 4 derivative actions were filed against Warner, Atari, and various directors and officers. The class actions were consolidated into one proceeding before the District Court for the Southern District of New York and on July 18, 1983 the class plaintiffs served a consolidated amended complaint covering all of the consolidated proceedings.

On April 16, 1985, the parties in the class and derivative actions entered into a proposed settlement for both the class and derivative actions, covering the class of purchasers of Warner securities between March 3, 1982 and December 8, 1982, including those who purchased call options and sold put options which were unexpired or open to them on December 8, 1982. On August 20, 1985, Judge Keenan of this Court approved the settlement proposal. The proposed class action settlement provided that the defendants would pay approximately $17 million plus accrued simple interest in settlement of all class action claims against them. The derivative claims were settled by the individual defendants for $2 million to be paid to Warner.

The Starkmans, after having first filed an objection to the proposed class settlement, opted out of the class and shortly thereafter began the instant litigation.

#### B. *The Starkman Transactions*

Plaintiffs bring their action as a result of losses sustained in the options market, a market whose most significant characteris-

tic is great risk. The Options Clearing Corporation (the "OCC"), the creator of the options in which plaintiffs speculated, defines an option as "a legal contract that gives the holder the right to by [a "call"] or sell [a "put"] a specified amount of the underlying interest at a fixed or determinable price ... upon exercise of the option." [1]

Plaintiffs speculated in "call" options, a contract giving the holder the right to purchase a specified amount of the underlying security at a specified price during the term of the option. A sale of a call option obligates the seller to deliver the underlying security to the OCC prior to expiration of the option if the option is exercised.

There is a great deal of risk associated with either the purchase or sale of call options. If one sells a call option and the price of the underlying security rises above the option price, the purchaser of the option will certainly "call" the stock and obtain it from the seller of the option at the "strike" price rather than at the higher market price. The seller of the option, if he owns the underlying security, will "lose" the profit foregone from his inability to sell the security for himself at the higher price. This foregone profit is, of course, offset in whole or in part by the amount of any premium received from the purchaser of the call option for bearing the risk. One who sells calls but does not own the underlying security ("naked calls") takes an even greater risk. Upon its exercise, the seller of the naked call must go out into the market to purchase the underlying security in order to resell it to the purchaser of the call.

Plaintiffs have been holders of Warner common stock since 1974. In 1982 plaintiffs were owners of 27,374 shares of Warner, and maintained significant investments in the securities markets, totalling nearly $2 million, inclusive of margin owed the broker. Plaintiffs had first traded options in 1980, sustaining a loss of about $10,000 on options written on stock of 20th Century–Fox. In January 1982, plaintiffs began to trade in Warner options by selling puts—trades not at issue in this lawsuit. Plaintiff Sheldon Starkman's investment strategy originated with his brother and stockbroker Michael Starkman. It was a strategy Sheldon Starkman admitted at deposition that he "did not entirely understand." [2]

By August 1982, Warner common stock had tumbled from a February 1982 high of 60 to a range in the mid-to-high 30s. Industry analysts had become "bearish" on Warner, and Sheldon Starkman, in part "because of such comments ... thought it a good idea to hedge [his] position in the stock against further loss by selling call options...." [3] By mid-September however, Warner stock had begun to rise again. Nevertheless, Sheldon Starkman continued to bet on a price *decline* by selling call options. Sheldon Starkman "could not entirely believe the continuing good sales releases from Atari and Warner ... especially in view of Mr. Harold Vogel's [of Merrill Lynch] still bearish position." [4] Warner stock continued to rise, however, and plaintiffs "continued almost in disbelief to sell options, even naked calls beyond [their] holdings." [5] Plaintiffs had not only sold calls during this period. They had also bought calls and profitted handsomely, earning over $120,000. [6]

Plaintiffs' frenetic trading continued throughout the fall and, by October, with Warner stock maintaining its upward movement, plaintiffs were writing call options nearly every day of the month. In late October plaintiffs began repurchasing calls to "bite the bullet," to try to cover August and September losses and to "jump

1. Options Clearing Corporation, *Characteristics and Risks of Standardized Options*, (1985) at 4 (Exhibit D to the affidavit of Leslie Gordon Fagen).

2. Starkman deposition at 100 (Exhibit C to Fagen Aff.).

3. Handwritten statement of Sheldon Starkman (Exhibit 27 to Exhibit D of Fagen aff.).

4. *Id.*

5. *Id.*

6. Exhibit 17 to Exhibit D of Fagen aff.

into a higher price that [plaintiffs] didn't think it would reach."[7] By mid-November plaintiffs had lost $460,000.[8] It is this loss which plaintiffs seek to recover.

*Discussion*

A. *Standard for Summary Judgment*

The Federal Rules authorize summary judgment where "there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The burden, therefore, is on the moving party to establish that no relevant facts are in dispute." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980).

B. *Liability Under Section 10(b) and Rule 10b–5*

Rule 10b–5 promulgated under Section 10(b) of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. Section 78j, makes it unlawful for any person

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. 240.10b–5.

In order to establish a claim for relief under these provisions, claimants must establish that (1) the instrumentalities of commerce were used, 15 U.S.C. Section 78j; (2) claimants sold or purchased securities, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); (3) defendants, acting with scienter, employed a scheme or artifice to defraud, made material misrepresentations or omissions of fact, or engaged in an act, practice or course of business that operated as a fraud, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); (4) the proscribed conduct occurred in connection with the purchase or sale of securities, *Superintendent of Insurance of State of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10, 92 S.Ct. 165, 167, 30 L.Ed.2d 128 (1971); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); and (5) defendants' conduct caused injury to the claimants. *Bloor v. Carro, Spanbock, Londin, Rodman, & Fass*, 754 F.2d 57, 61 (2d Cir.1985).

(1) *Whether Plaintiffs' Are Owed A Duty By Defendants*

This motion raises the question whether corporate insiders who fail to disclose material inside information and who sell shares in the corporation may be held liable under the anti-fraud provisions of the federal securities laws to persons who trade in options to purchase the corporation's securities. This question, while not entirely new to the courts, is one in which the law is unsettled. *See Laventhall v. General Dynamics Corporation*, 704 F.2d 407 (8th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (insiders trading in corporation stock owed no duty to disclose or abstain to purchaser of call options and, therefore, purchaser had no standing to allege violations of the Securities and Exchange Act); *Deutschman v. Beneficial Corporation*, 668 F.Supp. 358 (D.Del.1987) (purchaser of call options lacked standing to assert claim of misrepresentations and omissions by corporation where no insider traded in options or in corporation stock); *Bianco v. Texas Instruments*, 627 F.Supp. 154 (N.D.Ill.1985) (Purchasers and sellers of call options held to lack standing to allege securities fraud against corporation and its insiders for affirmative misrepre-

---

**7.** By mid-November plaintiffs had lost $460,000.

**8.** Complaint, Count 4.

sentations and for insider trading where option traders neither purchased nor sold corporation stock); *In re McDonnell Douglas Corporation Securities Litigation,* 567 F.Supp. 126 (E.D.Mo.1983) (purchasers of call options denied standing to sue corporate insiders with respect to claims based on nondisclosure of inside information and insider trading.) *See also In re Digital Equip. Corp. Securities Litigation,* 601 F.Supp. 311 (D.Mass.1984) (granting optionholders standing to sue for affirmative misrepresentations of corporation); *Backman v. Polaroid Corp.,* 540 F.Supp. 667 (D.Mass.1982) (because options are securities within meaning of Section 10(b) and because Section 10(b) applies to 'any person', purchaser of call options had standing to sue for insider trading of stock); *O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179 (S.D.N.Y.1981) (optionholders have standing to sue corporate insiders and their tippees who themselves traded in options based on inside information); *Lloyd v. Industrial Bio–Test Laboratories, Inc.,* 454 F.Supp. 807 (S.D.N.Y.1978) (purchaser of call options had standing to sue corporation for affirmative misrepresentations).

The ultimate question raises a number of subsidiary ones. May a corporation and its insiders be held liable to an options trader where neither the corporation nor the insiders have issued or traded in options and where neither have had any relationship with the options trader except insofar as the corporation's activities influence economic decisions in the marketplace generally? Does the corporation owe a duty to the market generally, so that those who own no part of a corporation but who nonetheless speculate on the corporation's future may hold the corporation liable for withholding from the market material information which would alter the speculator's analysis of the corporation's future? Because the value of an option is directly related to the value of the underlying security on which the option is written, ought we deem the option trader "close enough" to the corporation so that he may invoke the same protections as the common shareholder?

The purpose behind Section 10(b) and Rule 10b–5 "is to protect the investing public and to secure fair dealing in the securities markets by promoting full disclosure of inside information so that an informed judgment can be made by all investors who trade in such markets." *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 235 (2d Cir.1974); *Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787, 793 (2d Cir.1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). Nevertheless, although Section 10(b) "must be read flexibly, not technically and restrictively," *Superintendent of Insurance of State of New York,* 404 U.S. at 12, 92 S.Ct. at 169, Rule 10b–5 was not intended "to establish a scheme of investor's insurance." *List v. Fashion Park, Inc.,* 340 F.2d 457, 463 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

■ For plaintiffs to recover as the victims of fraud, as a threshhold matter, they must show that some duty was owed them and that that duty was breached. Liability must be grounded on "a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Chiarella v. United States,* 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980); see also *Dirks v. S.E.C.,* 463 U.S. 646, 657–58, 103 S.Ct. 3255, 3263, 77 L.Ed.2d 911 (1983) ("We reaffirm today that 'a duty to disclose arises from the relationship between the parties.' ") (quoting *Chiarella,* 445 U.S. at 231, n. 14, 100 S.Ct. at 1116, n. 14).

In *Chiarella,* the Supreme Court reversed the conviction of a financial printer who had deduced the identities of potential takeover targets from financial documents he had access to in the course of his printing activities and then purchased the targets' securities, realizing a substantial gain. 445 U.S. at 224, 100 S.Ct. at 1112. The Court rejected a "parity of information" rule: that "the use by anyone of material information not generally available is fraudulent ... because such information gives certain buyers or sellers an unfair advantage over less informed buy-

ers and sellers." *Id.* at 232, 100 S.Ct. at 1116.

The Court reasoned that "no duty could arise from petitioner's relationship with the sellers of the target company's securities, for petitioner had no prior dealings with them. He was not their agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence. He was, in fact, a complete stranger who dealt with the sellers only through impersonal market transactions." *Id.* at 232–233, 100 S.Ct. at 1116–17. The Court reiterated the established doctrine that "duty arises from a specific relationship between two parties." *Id.* at 233, 100 S.Ct. at 1117.

The reasoning in *Chiarella* relied in part on an earlier SEC decision and the common law which recognized the dependency of "duty" on "relationship" when imposing disclosure obligations. In *Cady, Roberts & Co.,* 40 S.E.C. 907 (1961), "the Commission decided that a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him." *Chiarella,* 445 U.S. at 227, 100 S.Ct. at 1114. The SEC there looked to "a relationship of trust and confidence" between insiders and the shareholders of a corporation. *Id.* at 228, 100 S.Ct. at 1114. That relationship gave rise to a disclosure obligation because of the "necessity of preventing a corporate insider from taking unfair advantage of the uninformed minority stockholders." *Id.* at 228–229, 100 S.Ct. at 1115, quoting *Speed v. Transamerica Corp.,* 99 F.Supp. 808, 829 (D.Del.1951).

The *Chiarella* court further noted that at common law "one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " *Chiarella,* 445 U.S. at 228, 100 S.Ct. at 1114, quoting Restatement (Second) of Torts § 551(2)(a) (1976).

In *Laventhall,* the Eighth Circuit Court of Appeals applied the reasoning in *Chiarella* to deal squarely with the issue presented in this case. *Laventhall* affirmed a lower court dismissal for lack of standing of a suit by a purchaser of calls against a corporation trading solely in its common stock. Laventhall alleged that General Dynamics, without disclosing a pending declaration of cash dividend, purchased 157,500 shares of its common stock in December 1978. On January 4, 1979, the corporation declared a dividend and a stock split. Laventhall brought suit against the corporation for trading its stock on the basis of undisclosed material inside information.

Employing the analysis developed by the Supreme Court in *Chiarella,* the court in *Laventhall* pointed out that the relationship between an optionholder and the issuer of the underlying security is fundamentally different from the relationship between a shareholder and the issuer. The court focused on *Chiarella*'s holding that "liability is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Laventhall.* 704 F.2d at 412, quoting *Chiarella,* 445 U.S. at 230, 100 S.Ct. at 1115. The *Laventhall* court noted that an issuer trading in its own stock and an optionholder are not parties to a transaction. The optionholder, before, during, and after his purchase or sale of options is still a complete stranger to the corporation "and ordinarily no duty would be owed." *Laventhall,* 704 F.2d at 412.

■ The court stated that the *"sine qua non* in every private action under section 10(b) is unauthorized trading of securities in the same market as the persons damaged." *Id.* Thus, a private plaintiff must "show some transactional nexus between defendant's trading and plaintiff's loss." *Id.* The court explained that the

legal justification for liability of the corporate insider to the outside uninformed investor is that if the insider trades on the basis of the inside information it may profit at the expense of outside investors who are disadvantaged in the same or

similar transaction by lack of the inside information. . . . However, the same analysis cannot be applied to a transaction between an options holder dealing with a third party and the corporate insider or his tippee dealing with shares of stock. There is only a speculative relationship between the insider's trading and the alleged loss caused to the options holder . . . the nondisclosure may have had some indirect effect on the option premium, but the insider's trading of stock on the stock market has no transactional nexus with the option holder's loss on the options exchange.

*Id.* We agree with the *Laventhall* court's reasoning and result. As in *Laventhall,* defendants here engaged in no transaction with plaintiffs and never were about to do so. After plaintiffs' purchases of call options "they were still complete strangers to [Warner], and ordinarily no duty would be owed." *Id.*

While face-to-face transactions are not required to give rise to liability, *Baretge v. Barnett,* 553 F.2d 290, 291 (2d Cir.1977), *Shapiro,* 495 F.2d at 228, 239 ("privity between plaintiffs and defendants is not a requisite element of a Rule 10b–5 cause of action for damages"), we agree with the *Laventhall* court that some "transactional nexus between defendant's trading and plaintiff's loss" need be shown. *Laventhall,* 704 F.2d at 412.

■ Here, none has been shown. There exists only the speculative relationship between the insiders' trading and the alleged loss caused to the options holder which *Laventhall* found inadequate. Plaintiffs here sold many and purchased some call options on Warner common stock between August and November 1982. These options were issued by the OCC, not Warner. Indeed, as the OCC explains, "as a rule, issuers of underlying stocks do not participate in the selection of their stocks for options trading."[9] Neither does Warner control the number or variety of options issued. "Issuers of underlying stocks have no responsibility regarding the issuance, the terms, or the performance of the options . . . and option holders have no rights as security holders of such issuers."[10] For performance of the contractual obligation, an option buyer "looks to OCC (in the sense that he relies on a backup system established by OCC) rather than to any particular buyer . . . the aggregate rights of option holders are matched by the aggregate obligations that option writers owe to OCC."[11] Warner then, is not a participant in the process of issuing, selling, purchasing or matching options.

■ Simply because the terms of an option and its exercise may be keyed to the value of an equity does not make it a derivative of an equity. The instrument stands alone, claiming no equity in the corporation, entitled to no vote, and with no fiduciary obligation of the management to the optionholder's interest.

In *O'Connor & Associates v. Dean Witter Reynolds, Inc. (O'Connor I),* 529 F.Supp. 1179, 1184–85 (S.D.N.Y.1981) (Lasker, J.), the Court, while granting an optionholder standing to allege fraud against insiders who traded options contemporaneously with the optionholder, stated that

> the relationship between corporate insiders and shareholders stands in stark contrast to the lack of relationship between the corporate insiders and options traders . . . the dispositive distinction is that the options trader has no equity interest in the corporation by virtue of his selling or purchasing an option on the corporation's stock . . . the optionholder is owed no special duty by the officers and directors of the corporation because, quite simply, the corporation is not run for his benefit . . . In short, as a shareholder one is entitled to the benefits of a trust relationship. As an options trader, one is not.

Optionholders should not, and presumably do not, expect that management owes

---

**9.** *Characteristics and Risks of Standardized Options,* at 61.

**10.** *Id.*

**11.** *Id.* at 60.

them obligations of disclosure similar to those owed to shareholders. Optionholders, who may ultimately reap the rewards of the corporation's successful operation, do not bear the same costs as ordinary shareholders do. These costs include outlays to provide incentives to management to enhance performance and reduce self-dealing. Shareholders, and not optionholders, pay for the right to replace management or effect a change in control.

This Court does not base its decision solely on the ground that plaintiffs were not shareholders at the time of the misstatements and/or omissions complained of. Nor, of course, does this Court suggest that optionholders who exercise their options and then purchase or sell the underlying security are in any way precluded from recovery for fraud. The Court is mindful that *Cady, Roberts* extended the insider's duty to disclose or abstain to incipient as well as preexisting shareholders. It is quite true, as Learned Hand wrote, that a director and officer does assume "a fiduciary relation to the buyer by the very sale; for it would be a sorry distinction to allow him to use the advantage of his position to induce the buyer into the position of a beneficiary although he was forbidden to do so once the buyer had become one." *Cady, Roberts*, 40 S.E.C. at 914, n. 23, quoting *Gratz v. Claughton*, 187 F.2d 46, 49 (2d Cir.), *cert. denied*, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951).

In *O'Connor I*, this Court did allow a seller of call options to maintain allegations of insider trading against insiders and their tippees who bought call options contemporaneously. While, as noted above, the Court distinguished the duty of trust and confidence owed by corporate insiders to shareholders from the absence of any such duty to optionholders, it read *United States v. Newman*, 664 F.2d 12 (2d Cir. 1981), *aff'd after remand* 722 F.2d 729 (2d Cir.1983) (unpublished order), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), a criminal action, to mean that in a civil case, where corporate insiders breach fiduciary duties to some parties, other parties may recover since "the alleged practice constitutes a fraudulent practice within the meaning of the securities law." *O'Connor I*, 529 F.Supp. at 1185. Thus, Judge Lasker reasoned, the misappropriation by an employee of an employer's information might give rise to liability to injured third parties based on the breach of fiduciary duty to the employer but not to them.

*O'Connor I* is distinguishable from the case at bar in several respects. First, in *O'Connor I*, the court, in granting standing to plaintiffs, relied heavily upon the fact that defendants contemporaneously traded the same option instruments and profitted thereby. Here, plaintiffs do not allege that defendants traded in Warner options at any time. See also *Bianco*, 627 F.Supp. at 154. Further, in *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984), the Court of Appeals affirmed the dismissal by Judge Pollack of this Court of an action for damages by a shareholder of a target corporation who sold his stock unknowingly prior to the public announcement of a tender offer, to a tippee whose knowledge of the takeover was due to the misappropriation of non-public information by an employee of the tender offeror's investment banker. The Court of Appeals stated that "nothing ... in *Newman* suggests that an employee's duty to 'abstain or disclose' with respect to his employer should be stretched to encompass an employee's 'duty of disclosure' to the general public." 719 F.2d at 13. The court then approved the district court's conclusion that "plaintiff cannot hope to piggyback upon the duty owed by defendants [investment banker's employee and his tippees] to the employer [investment banker] of one defendant and the employer's client. There is no 'duty in the air' to which any plaintiff can attach his claim." *Id.*, quoting *Moss v. Morgan Stanley, Inc.*, 553 F.Supp. 1347, 1353 (S.D.N.Y.1983).

It is true, as Judge Lasker subsequently noted in *O'Connor & Associates v. Dean Witter Reynolds, Inc. (O'Connor II)*, 600 F.Supp. 702 (S.D.N.Y.1985), that the *Moss* defendants who traded non-public information were not "traditional" insiders. But nothing in *Moss* indicates that had the de-

fendants in that case been traditional insiders, they would have owed duties, beyond those owed to the shareholders, to the public at large, including optionholders who were betting on price changes in the company's stock and with whom the insiders had no dealings. Indeed, as the footnote to *Moss*, quoted in *O'Connor II*, states, "[o]rdinarily, 'insiders' ... owe a duty to a corporation's shareholders ..." *Id.*, quoting *Moss*, 719 F.2d at 10–11, n. 8.

The *O'Connor II* court, while acknowledging that the insiders there owed no fiduciary duty to the optionholders, relied upon *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228 (2d Cir.1974) concluding that "by virtue of their *fiduciary* duty to the corporation and its shareholders, corporate insiders become subject to the *separate* duty to either 'abstain or disclose' ... this additional duty is owed 'to the investing public.' *Shapiro* [full citation omitted.]"

But *Shapiro*, we think, should not be read to hold that insiders owe a duty to the entire investing public so that someone trading in a security different from that traded by the insiders who arguably suffers a loss due to an insider's misrepresentation or omission may hold the insider liable. The discussion in *Shapiro* from which the quote on duty to the investing public is drawn does not concern the nature of the relationship upon which liability may rest but rather centers on the question of whether privity is required to prove causation-in-fact. Recognizing that national markets are the scene of a multitude of trades daily and that a plaintiff will likely be unable to prove he purchased or sold to a defendant, the court held that proof of causation will not depend "upon the character of the transaction—face-to-face versus national securities exchange ..." *Shapiro*, 495 F.2d at 240. The *Shapiro* court did not approve the proposition that an insider who trades in the issuer's securities might be liable to a person who does not.

It should also be noted that this Court, before *Chiarella*, did grant a purchaser of call options standing to maintain allegations that fraudulent misrepresentations by a corporation and its subsidiary served to artificially inflate the price of the stock. *Lloyd v. Industrial Bio-test Laboratories, Inc.*, 454 F.Supp. 807 (S.D.N.Y.1978). The Court based its decision upon the fact that an option is a security within the meaning of Section 10(b) and Rule 10b–5 and that the Section and the Rule apply to "any person" engaging in certain deceptive or fraudulent activities. For purposes of withstanding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), plaintiff, by alleging that defendants engaged in those activities, had standing to sue. See also *Backman*, 540 F.Supp. at 671; *In re Digital Equipment Corp. Securities Litigation*, 601 F.Supp. at 311.

*Lloyd* was decided before *Chiarella*, however, and did not analyze defendants' duty to plaintiff in terms of *Chiarella's* discussion of relationships of trust and confidence and obligations to disclose. Moreover, while the Court in *Lloyd* is correct that options are securities, 15 U.S.C. § 78c(a)(10), and that Section 10(b) and Rule 10b–5 apply to "any person", both the Section and the Rule prohibit fraudulent acts only "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. The Warner options are securities but they are not securities of Warner. It is not alleged that defendants traded in these securities nor is it alleged that any manipulative or deceptive acts were directed at the options market. "Plaintiff's trading in option contracts is simply too remote to satisfy the 'in connection with' requirement when the alleged deceptive acts are merely corporate misstatements and nondisclosures not directed in any way to the options market." *Deutschman*, 668 F.Supp. 358; quoting *Bianco*, 627 F.Supp. at 161.

This Court recognizes the need for a securities market the integrity and fairness of which potential investors will be convinced and that historically the courts have taken a leading role in protecting participants in the market from misleading and deceptive practices. It is also clear that the price of an option depends in large measure on the price of the underlying security and that misleading information

affecting the price of the stock will normally affect the price of the option. Nevertheless, options trading is recognized as inherently more risky than investing in shares and an investor chooses which risk/return strategy to follow. Further, the cost of a great expansion of liability to optionholders and concomitant larger judgments against corporations will ultimately be borne by the shareholders of public corporations, "usually the most important segment of the total category of investors intended to be protected." Cohen, Truth in Securities Revisited, 79 Harv.L.Rev. 1340, 1370 (1967); *See S.E.C. v. Texas Gulf Sulpher Co.*, 401 F.2d 833, 867 (2d Cir.1968) (Friendly, J. concurring), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Indeed, as "Chief Judge Cardozo observed, caution is the watchword where the creation of a duty results in 'a liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *Deutschman*, 668 F.Supp. 358, quoting *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931).

As the *Bianco* court stated, "we do not feel obligated to expand the scope of liability under Section 10(b) to make this obviously uncertain market safer for the trader who has no connection whatsoever to the issuer of the underlying stock." *Bianco*, 627 F.Supp. at 161. As noted above, Warner had no connection whatsoever with the issuance, purchase, sale, or matching of the options. Warner did not control the number or variety of options issued. Warner's "potential liability to options holders is limited only by the whims of the options writers." *Id.* Under *Chiarella* we do not find the required relationship between defendants and plaintiffs close enough to impose liability. Thus the Court grants defendants' motion for partial summary judgment pursuant to Fed.R.Civ.P. 56.

**(2)** *Fraud on the Market*

Although plaintiffs do not allege any "fraud on the market" theory in their complaint, they do allege it in their reply to defendants' motion for summary judgment.[12] Plaintiffs, however, misunderstand the nature of the theory and what purpose it is intended to serve.

Plaintiffs assert that "even if the plaintiff did not rely on the false statements made by Warner, or even if he did not believe them, the making of false statements by Warner and failing to disclose pertinent information is a 'fraud on the market' and actionable even in the absence of reliance or action taken with respect thereto." [13]

Indeed, plaintiffs all but admit that they did not rely on either the alleged material misrepresentations or the market price. At oral argument, plaintiffs' attorney stated that "Warner then comes out and submits an optimistic statement which the market believes. Because the market believes it, the market goes up and obviously, *even though Mr. Starkman was right in his determination*, the false reports given by Warner improperly inflated the market and, under those circumstances, Mr. Starkman was hurt." (emphasis added).[14]

Plaintiff's assertions regarding the fraud on the market theory are simply incorrect. That theory does not dispense with a reliance requirement but rather permits a more flexible construction of it. *See, e.g., Zuckerman v. Harnischfeger Corp.*, 591 F.Supp. 112, 122 (S.D.N.Y.1984); *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). The theory affords a plaintiff a presumption of reliance which the defendant may rebut. In essence, the theory accepts that misrepresentations may inflate the price of a stock and that a potential investor may detrimentally rely on the integrity of the market price. In *Panzirer v. Wolf*, 663 F.2d 365 (2d Cir. 1981), *vacated as moot*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982), for exam-

---

**12.** Defendant's Reply Memo at 7.

**13.** *Id.*

**14.** Oral argument transcript at 16.

ple, the Court of Appeals held that a plaintiff who relied on the integrity of the market, where the market price was distorted through the filing of a materially misleading annual report, "stated a sufficient claim of reliance on the misrepresentation or omission." 663 F.2d at 367. The court recognized that *some* reliance was still required, stating that the "function of requiring the plaintiff to show reliance in a 10b–5 action is to permit only those injured by fraud to sue." *Id. See also Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1975).

## C. *The Martin Act Claims*

Plaintiffs also assert claims under Sections 339–a and 352–c of the General Business Law of New York (the "Martin Act"). In *CPC International v. McKesson Corporation,* 70 N.Y.2d 268, 519 N.Y.S.2d 804, 514 N.E.2d 116 (N.Y.1987) the New York Court of Appeals held that no implied private right of action exists under Section 352–c. While the court did not expressly state that no private right of action exists under any part of the Martin Act, it did state that "an implied private action is not consistent with the legislative scheme underlying the Martin Act and, specifically Section 352–c...."

■ Even if Section 339–a were held to permit a private right of action, plaintiffs would not benefit. As stated previously, plaintiffs do not allege they purchased call options from defendant or that defendants traded in options at all. The Martin Act "cannot be reasonably extended to cover a purchaser who does not make his purchase from the misrepresenter...." *Kaufman v. Chase Manhattan Bank, N.A.,* 581 F.Supp. 350, 355 (S.D.N.Y.1984), *quoting Herdegen v. Paine, Webber, Jackson, & Curtis,* 31 Misc.2d 104, 220 N.Y.S.2d 459 (N.Y.Sup.1961) (dismissing the claim where plaintiff neither bought nor sold securities from defendants as a result of the misrepresentations, nor were the misrepresentations designed to induce such a purchase or

sale); *but see Whitbread (US) Holdings, Inc. v. Baron Philippe de Rothschild,* 630 F.Supp. 972 (S.D.N.Y.1986).

Consequently, plaintiffs' Martin Act claims are dismissed.

## D. *The Common Law Fraud Claims*

■ Plaintiffs also allege that they have been the victims of common law fraud.[15] An action for common law fraud in New York requires proof by clear and convincing evidence of: (1) a misrepresentation or omission of material fact; (2) intent to deceive (scienter); (3) reliance by the plaintiffs; and (4) injury to the plaintiffs caused by plaintiffs' reliance on the misrepresentation or omission. *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Idrees v. American University of the Caribbean,* 546 F.Supp. 1342, 1346 (S.D.N.Y.1982).

■ Defendants' duty to plaintiffs is no greater under common law than under Rule 10b–5. Thus, for the reasons stated in the discussion of liability under Section 10(b) and Rule 10b–5, plaintiffs' common law fraud claim for options trading losses is dismissed.

### *Conclusion*

Defendants are hereby granted partial summary judgment on plaintiffs' options trading claims pursuant to Fed.R.Civ.P. 56.

SO ORDERED.

---

**15.** Complaint, Count 4.