George **HYBERT,** Joan Smith, and Joan Smith as Trustee of the Mary Duke Smith Trust, Plaintiffs,

v.

**SHEARSON LEHMAN/AMERICAN EXPRESS INC.** and William Cohen, Defendants.

No. 84 C 10327.

United States District Court, N.D. Illinois, E.D.

April 12, 1988.

Susan M. Keegan, Jerome F. Crotty, Rieck & Crotty, P.C., Daniel V. Kinsella, Weatherhead & Kinsella, Chicago, Ill., for plaintiffs.

Peter B. Newton, Neal, Gerber & Eisenberg, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, Chief Judge.

This securities fraud and RICO case is before the court on the motion of defendants Shearson Lehman/American Express, Inc. and William Cohen for summary judgment. Also before the court is defendants' motion to strike portions of plaintiffs' Local Rule 12(f) Statement. For the reasons stated below, the motion for summary judgment is granted in part.

1. Herbert G. Mayer was the broker who handled plaintiffs' accounts. In April 1984 he pled guilty to three counts of tax fraud. *United States v. Herbert Mayer*, No. 84 CR 255 (N.D.Ill.). On June 6, 1984 he committed suicide.

2. Options contracts on common stock are described as either "puts" or "calls." A "put" option conveys the right to sell a specified number of shares in the underlying common stock for a specified "exercise price" at or before a specified time, or "expiration" date. A "call" option con-

## FACTS AND PROCEDURAL HISTORY

### The Allegations

The plaintiffs in this action are George Hybert ("Hybert"), Joan Smith ("Smith"), and Joan Smith as Trustee for the Mary Duke Smith Trust. Defendants are Shearson Lehman/American Express Inc. ("Shearson") and William Cohen ("Cohen"). Hybert had an account with Herbert G. Mayer[1] ("Mayer"), one of Shearson's account executives, for approximately twenty-five years. In the early 1980s, Mayer began buying options for Hybert's account—selling naked puts and calls.[2] Answer to Amended Complaint ("Amended Answer") at ¶ 15.

Hybert introduced Smith to Mayer in 1981. *Id.* at ¶ 16. Mayer then submitted a Shearson financial statement to open Smith's account, one which authorized trades only through Shearson's New York office. This statement listed Smith's income at $30,000 per year. Plaintiffs allege that within two weeks Mayer falsified a second financial statement. The false statements included changing Smith's annual income to $80,000; doubling her liquid net worth to $1,000,000; and doubling her total net worth to $1,500,000. Mayer also filed a financial statement which overstated Mary Duke Smith's assets and contained other false statements. Amended Complaint at ¶¶ 18–19. And, Mayer made inaccurate statements on Hybert's financial statements, inventing assets in order to make him appear to be more suitable for trading naked call options. *Id.* at ¶ 20. Mayer allegedly backdated Smith's false financial statement to conform with the first. This second financial statement allegedly made it possible for Mayer to trade naked options on Smith's behalf. *Id.* at ¶ 18.[3] Plaintiffs also allege that Mayer

veys the right to buy a specified number of shares for a specified exercise price at or before the specified expiration date. *See Bianco v. Texas Instruments, Inc.*, 627 F.Supp. 154, 157 n. 4 (N.D.Ill.1985).

3. The Amended Answer to this paragraph reads, "The financial statements to which reference is made in this paragraph were marked as exhibits, received in evidence, and testified to by many of the witnesses who appeared and testified at the arbitration proceedings, the tran-

falsified other documents, inflating income and assets for other clients, and that the defendants had knowledge of this. *Id.* at ¶ 21.

Both Hybert and Smith claim that they were unable to interpret their accounts and relied completely on Mayer's knowledge. *Id.* at ¶¶ 16–17. They claim that Mayer intentionally churned [4] their accounts, and that defendants knew or should have known of the churning but failed to inform the plaintiffs. *Id.* at ¶ 22. The plaintiffs asked Cohen, the manager of Shearson's Chicago office, Amended Answer at ¶ 7, for help in interpreting their accounts, which had grown to include "literally thousands of options positions" in "at least 17 underlying stocks." They received no assistance. Amended Complaint at ¶ 23–24.

Hybert claims damages of over $219,000; Smith claims more than $172,167; and the Trust's damages are alleged to be more than $48,445.

*The Current Complaint*

Plaintiffs filed their amended complaint on August 6, 1987, alleging against both defendants, except as to the first count which is against Shearson only, claims under:

(1) RICO;

(2) § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b);

(3) 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q;

(4) Rules 405 and 723 of the New York Stock Exchange and §§ 2, 16 of the National Association of Securities Dealers (NASD) Rules of Fair Practice, and Rules 9.7 and 9.9 of the Chicago Board of Options Exchange (CBOE);

(5) the Illinois Securities Law of 1953, Ill.Rev.Stat. ch. 121½, ¶ 137.12;

(6) the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Rev.Stat. ch. 121½, ¶ 262;

(7) common law fraud;

(8) common law breach of fiduciary duties;

(9) common law negligence;

(10) a demand for an accounting.

Defendants answered on August 17, 1987, denying the allegations, and pleading, *inter alia,* the defense of *res judicata.* Now defendants move for summary judgment, arguing that all claims currently before the court are precluded by an earlier arbitration. They also move to strike large portions of plaintiffs' Rule 12(f) statement.

Plaintiffs argue that the RICO claim and the facts underlying it—particularly the fraudulent scheme whereby Mayer presented doctored financial statements to Shearson—were never heard by the arbitrators as the issue did not come to light until the hearing itself. They also argue that their other claims are not barred because Shearson failed to disclose material facts before the arbitration or because plaintiffs now state new claims, or ask for new relief, which was not (and in some cases could not have been) brought before the arbitrators. They also note that defendant Cohen was not a party to the arbitration.

*The Arbitration*

Prior to bringing this action in this court, plaintiffs voluntarily submitted their claims against Shearson and Mayer (not Cohen) to arbitration before the CBOE on July 13, 1983.

---

script of which was previously filed with this Court.... To the extent that the allegations of this paragraph would mischaracterize, whether by way of omission or otherwise, those exhibits and the testimony relating thereto, they are denied."

The defendants make an identical reply to all the allegations summarized in the remainder of this sub-section of this opinion.

**4.** As indications of churning the plaintiffs offer the following data:

| Account | Year | Turnover Ratio | Cost Equity Maintenance Factor | Option Contract Index |
|---------|------|------|------|------|
| Hybert | 1980 | 4.9 | 17 | .8 |
| | 1981 | 5.9 | 7 | .7 |
| | 1982 | 8.3 | 2.6 | 2.2 |
| Smith | Not stated | 3.6 | 14.25 | .9 |

The first paragraph of the CBOE "submission agreement," signed by representatives of Shearson and the plaintiffs in this action, stated that

The undersigned parties hereby submit to arbitration in accordance with the Rules of the Chicago Board of Options Exchange to present the matter in controversy *as set forth in the attached statement of claim,* answers and all related counterclaims and/or third party claims which may be asserted. (emphasis added)

Plaintiffs' Rule 12(f) Statement, Exhibit E at 1.

Plaintiffs' "statement of claim," presented to the CBOE arbitration panel, alleged that Mayer was unqualified to give advice relating to options, that Shearson and/or Mayer violated the policy of the Board of Governors of the NASD by permitting Mayer to give advice with the knowledge that he was unqualified to do so, and that plaintiffs relied on this advice to their detriment. Statement of Claim at ¶• 22–29, 32. Based on these facts, the "statement of claim" alleged that Shearson and/or Mayer violated New York Stock Exchange and NASD rules of fair practice by "failing to properly supervise" plaintiffs' accounts. *Id.* at ¶ 31. Shearson and/or Mayer also allegedly encouraged and permitted plaintiffs "to enter into investment positions that were unsuitable" to their investment objectives. *Id.* at ¶ 33.

Prior to the arbitration, plaintiffs sought discovery regarding other claims against Mayer. Shearson allegedly blocked this discovery effort, and the CBOE did not require Shearson to produce other customers' files to plaintiffs' counsel. Rule 12(f) statement at ¶ 10.

The arbitration hearing was held on November 13 and 14, 1984. It lasted two days and the transcript covers 465 pages. Both

parties were represented by attorneys. During the arbitration, plaintiffs, although they did not specifically allege it in their statement of claim, submitted proofs and testimony on the issues of churning[5] (defendants count 49 pages of testimony devoted exclusively to plaintiffs' churning claims, Defendants' Reply Memorandum In Support of Amended Motion for Summary Judgment at 5) and excess commissions. Defendants' Rule 12(e) Statement at ¶¶ 15–18. Plaintiffs and defendants were examined and cross-examined. The parties do not agree as to who knew what, and when they knew it, about Mayer's falsification of the plaintiffs' financial documents. Nor do they agree about exactly what was produced when, or what was presented to the arbitrators. It is undisputed, however, that defendants produced legible copies of the plaintiffs' allegedly falsified financial statements no later than the second day of the arbitration. Supplemental Affidavit of Patrick J. O'Donnell (plaintiffs' former counsel).

The arbitrators' decision, dated November 28, 1984, is worth quoting in full:

### AWARD

The above-captioned parties [Hybert, Smith, Smith Trust, and Shearson/American Express] appeared at a hearing on November 13 and 14, 1984 and had full opportunity to present arguments and evidence.

Having been fully advised by the parties and after due deliberation, the undersigned [five] arbitrators award as follows:

No award rendered. Filing fees on deposit with the Exchange are retained.

Appendix to Defendants' Statement of Material Facts Filed Pursuant to Local Rule 12(e), Exhibit B.

---

Amended Complaint at ¶ 28. By 1982, the commissions generated by the trading of plaintiffs' accounts alone provided Mayer with approximately one-third of his gross commission income for that year. *Id.*

**5.** Defense counsel objected at one point that, I'm rather surprised to hear it's a churning case, since I haven't seen that in the statement

of claim. I've seen suitability, I've seen questions raised as to Mr. Mayer's classification to trade options, and ... [interruption]

. . . .

And we also believe that the case involves an issue as to Shearson's supervision of the trading in these accounts.

Plaintiffs' Rule 12(f) statement at Exhibit H.

Judge Plunkett confirmed the arbitration panel's decision on April 19, 1985. *Shearson v. Hybert*, No. 85 C 385, Minute Order (N.D.Ill. Apr. 19, 1985) (Plunkett, J.). On February 11, 1986, plaintiffs' appeal, No. 85–1849, was dismissed with prejudice, due to their failure to file briefs following the withdrawal of their attorney on or before July 31, 1985. Defendants' Rule 12(e) Statement at ¶ 28.

DISCUSSION

The key issue before the court on this summary judgment motion is the preclusive effect of the CBOE arbitration. With a few exceptions, defendants' motion to strike almost every line of plaintiffs' Rule 12(f) statement turns on whether the facts asserted are material. The materiality of these challenged statements of fact in turn depends upon what claims or issues are precluded by the arbitration.

■ *Res judicata* comes in two forms: claim preclusion, which prevents the relitigation of a claim previously tried and decided, and issue preclusion (sometimes called collateral estoppel), which bars the relitigation of issues actually adjudicated in previous litigation between the same parties. *See* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4402 at 7 (1981). In addition, the doctrine of bar can extend the effect of claim preclusion to matters closely related to, but not actually litigated in, the prior adjudication. *Lee v. City of Peoria*, 685 F.2d 196, 198 (7th Cir.1982) (*"res judicata* bars not only those issues which were actually decided in the prior action but also any issues which could have been raised").

*Preclusive Effect of the CBOE Arbitration*

■ We begin with the obvious: at this late date the validity of the CBOE arbitration is unchallengeable. A district court confirmed it, 9 U.S.C. § 9, and the Seventh Circuit dismissed the plaintiffs' appeal, albeit by default. Once an arbitration decision has been confirmed by a district court, it is entitled to the same preclusive effect as would be given a decision of that court. *Cf. Restatement (Second) of Judg-*

*ments* § 84(1) (1982) (arbitration award generally has same *res judicata* effect as court decision). The confirmed arbitration is therefore claim preclusive as to plaintiffs' claims against Shearson. However, claim preclusion applies only when there is an "identity of parties or privies in the two suits." *Brown v. J.I. Case Co.*, 813 F.2d 848, 854 (7th Cir.), *cert. denied, sub nom. Brown v. Case Co.*, — U.S. —, 108 S.Ct. 258, 98 L.Ed.2d 215 (1987). Here, the arbitration had Mayer, not Cohen, as a defendant. Therefore, the arbitration is claim preclusive against Cohen only to the extent that Cohen was in privity with either Mayer or Shearson. The same applies to the reach of the doctrine of bar.

■ The doctrine of issue preclusion also applies. Here, the arbitration decision prevents the relitigation of "any issue actually litigated and determined if its determination was essential to the matter." *Restatement (Second) of Judgments* § 17(3) (1982). Thus, both defendants may be entitled to full or partial summary judgment if they can establish that any of the plaintiffs' claims are based entirely on facts that were essential to the CBOE arbitrators' decision. *See Kunzelman v. Thompson*, 799 F.2d 1172, 1176 (7th Cir.1986).

*Scope of the Arbitration Decision*

■ The obvious, however, does not get us very far. It is "not at all clear that arbitration awards [can] be given a *res judicata* or collateral estoppel [i.e. issue preclusion] effect in a related judicial proceeding." *Giles v. Blunt, Ellis & Loewi, Inc.*, 845 F.2d 131, 133–135 (7th Cir.1988) (citing *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984)). "The first step ... in applying [issue preclusion] to issues that were determined in a previous proceeding is to figure out exactly which issues were in fact 'determined.'" *Jones v. Alton*, 757 F.2d 878, 885 (7th Cir.1985)." *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 637 F.Supp. 1333, 1336 (N.D.Ill.1986). In deciding what the CBOE determined, this court must

make an examination of the record, including the pleadings, the evidence sub-

mitted, and any findings of the arbitrator. *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569 [71 S.Ct. 408, 414, 95 L.Ed. 534] [,572]. The court must decide, based on this record, whether a rational factfinder could have reached a conclusion based upon an issue other than that which the defendant seeks to foreclose from consideration. *See Ashe v. Swenson,* 397 U.S. 436, 444 [90 S.Ct. 1189, 1194, 25 L.Ed.2d 469] (1970). When the issue for which preclusion is sought is the only rational one the factfinder could have found, then that issue is considered "determined" by the factfinder, even if no explicit finding of that issue has been made. *See id.* Nonetheless, the party asserting the preclusion of an issue bears the burden of showing "with clarity and certainty" what was determined by the prior judgment. *Jones v. Alton,* 757 F.2d at 885. *See also* Restatement (Second) of Judgments § 27 comment d (1980).... In the absence of this showing, the preclusion of an issue is inappropriate. *Jones,* 757 F.2d at 886. (parallel citations omitted) *Tamari,* 637 F.Supp. at 1336–37.

Here, the CBOE arbitrators' decision—"No award rendered"—is fatally terse. *See O'Neill v. Merrill Lynch, Pierce, Fenner & Smith,* 654 F.Supp. 347, 352–53 (N.D.Ill.1987). It tells us who wins, but not what issues were decided, and it does not tell us how the arbitrators arrived at that decision.[6] The record generated by the arbitration is a long one, with a 465 page transcript and many exhibits; defendants correctly note that many of the issues which plaintiffs now seek to litigate were raised, at some length, during the arbitration. But this alone proves little. We do not know what went on in the arbitrators' minds. In a case awash with issues, one can imagine several possible explanations for the arbitrators' decision. We cannot hold that defendants have shown "with clarity and certainty" that any particular fact was the only rational one the factfinder could have found to reach the result. Therefore, we must conclude that the arbitrators' judgment has no issue preclusive effect as to plaintiffs' claims against either defendant.[7]

■ By contrast, the arbitration decision does have a claim preclusive effect, even though the sweep of claim preclusion is diminished by the uncertainty as to what was actually litigated. We do know, however, that the arbitration must stand for something. Defendants argue, more or less, that the claim preclusion extends to any matter which was discussed in the arbitration, or for which material evidence was introduced, even if the materiality became obvious only after the fact.

Given the brevity of the arbitration decision, we are persuaded that only the specific matters raised in the plaintiffs' written CBOE statement of claim can be established "with clarity and certainty" to have been "determined" by the arbitration. Whatever else the arbitrators may or may not have done, they were certainly ruling on the claims which triggered the arbitration in the first place. *See Williams v. E.F. Hutton & Co., Inc.,* 753 F.2d 117, 119 (D.C.Cir.1985) (claims in submission agreement are barred).[8]

*Extent of Claim Preclusion (Bar)*

■ The doctrine of bar can preclude litigation of a claim even if it was not actually "determined" in a previous adjudication:

> [R]es judicata operates to bar litigation of matters that *should* have been raised

---

**6.** A district court's judgment would not suffer from these defects. "In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusion of law thereon...." Federal Rule of Civil Procedure 52(a).

**7.** Ordinarily, a non-privy—such as Cohen may be—can avail himself of collateral estoppel from a judgment in favor of an unrelated defendant in a case relating to the same events. As we find that the arbitration has no issue preclusive effect, this avenue is not available to Cohen whether or not he was in privity with Shearson or Mayer.

**8.** Defendants cite *Pallante v. Paine Webber, Jackson and Curtis, Inc.,* Fed.Sec.L.Rep. [CCH] ¶ 92,219 (S.D.N.Y.1985) [available on WESTLAW, 1985 WL 1360]. We simply do not agree with the decision in *Pallante* that all claims are barred under these circumstances.

in the prior proceeding. The prior judgment is conclusive "not only in respect of every matter which was actually offered and received to sustain the demand or to make out a defense, but also as to every ground of recovery or defense which might have been presented." (emphasis added) *Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 657 F.2d 939, 945 (7th Cir.1981) (quoting *Mendez v. Bowie*, 118 F.2d 435, 440 (1st Cir.), *cert. denied*, 314 U.S. 639, 62 S.Ct. 76, 86 L.Ed. 513 (1941)). *See also Rudell v. Comprehensive Accounting Corp.*, 802 F.2d 926 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1351, 94 L.Ed.2d 521 (1987) (*res judicata* barred affirmative defense of fraudulent inducement to enter into a contract when party failed to assert defense before arbitration panel with jurisdiction to hear it).

■ However, an arbitration differs significantly from a court decision for *res judicata* purposes. "The arbitration agreement is a contract and the court will not rewrite it for the parties." *Williams*, 753 F.2d at 119. Therefore,

> [a]lthough courts recognize a strong federal policy in favor of voluntary commercial arbitration, and will generally bar claims falling under an arbitration clause even if those claims were not actually raised in the arbitration proceeding, arbitration cannot be raised as a bar to claims falling outside the arbitration agreement.... There is no duty to arbitrate matters not subject to the arbitration agreement, and no authority on the part of arbitrators to consider matters not necessary to the resolution of disputes actually submitted. The crucial inquiry ... is whether under the arbitration agreement the claims *should* have been considered.... (citations omitted) (emphasis in original)

*Id. See also Giles v. Blunt, Ellis & Loewi, Inc.*, 845 F.2d 131, 133–135 (7th Cir.1988) (arbitration limited to matters strictly within terms of agreement drafted by broker).

Confirmation of an arbitration award in federal court does not add to the claim preclusive effect of an arbitration decision, except as to the narrow class of issues which can be raised on a motion to vacate the award. *See* 9 U.S.C. § 10. The confirmation means only that the arbitration decision is valid, i.e. was not procured by corruption, fraud or other prohibited misconduct, and that the arbitrators have not exceeded their powers. *See id.*

■ The defendants argue that the relevant agreement to arbitrate is not the "submission of claim" or the "agreement to arbitrate," but instead the customer's agreement that each of the plaintiffs signed with Shearson. These customer's agreements required the mandatory submission to arbitration of "any controversy" arising out of the plaintiffs' dealings with Shearson.[9] Defendants argue that we should read the "any controversy" language of the customer's agreements to mean that all claims should have been brought before the CBOE, and that therefore the arbitration creates claim preclusion for any controversy regardless of whether it was actually arbitrated, whether the arbitrators (or, for that matter, the plaintiffs) had any idea that the claim existed or that the panel had jurisdiction to entertain it. We cannot adopt this reasoning. *See Williams*, 753 F.2d at 119. *Cf. Rudell*, 802 F.2d at 931 n. 5 (question of preclusive effect of such a customer's agreement remains open in this circuit). "It is well-established that the doctrine of *res judicata* is applicable only in cases where the party against whom it is asserted had a full and fair opportunity to litigate the issue." *Rudell*, 802 F.2d at 932.

We would reach a similar conclusion even if we did not view the arbitrators' jurisdiction as delineated by the "statement of claim." Even if we were to assume that the CBOE panel had the full jurisdiction to which it was entitled by law in 1983, we would find that its decision has a limited *res judicata* effect. The Restatement rule, from which the federal *res judicata* rule

---

**9.** The plaintiffs elected to exercise their rights, under CBOE rules, to arbitrate in front of the CBOE, *see* Defendants' Rule 12(e) Statement at

¶¶ 22–23, even though the CBOE was not one of the arbitration tribunals listed in any of the customer's agreements.

borrows, *see, e.g., Shaver v. F.W. Woolworth Co.,* 840 F.2d 1361, 1364–65, (7th Cir.1988) (*Restatement (Second) of Judgments* § 24), is

> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rule[ ] of . . . bar . . ., the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

> (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Restatement (Second) of Judgments* § 24 (1982). *See also, e.g., Shaver,* 840 F.2d at 1365 (age discrimination case is *res judicata* for later breach of contract action alleging contract to honor seniority); *Matter of Energy Cooperative, Inc.,* 814 F.2d 1226, 1230–31 (7th Cir.), *cert. denied, sub nom. Energy Cooperative, Inc. v. Phillips Petroleum Co.,* — U.S. —, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987) (quoting § 24 with approval); *Car Carriers, Inc. v. Ford Motor Co.,* 789 F.2d 589, 593 n. 6 (7th Cir. 1986) (citing same). And,

> The rule of § 24 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action

> (1) To present evidence or grounds or theories of the case not presented in the first action, or

> (2) To seek remedies or forms of relief not demanded in the first action.

*Id.* at § 25.

> But,

> [T]he general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant [if] . . .

> . . . .

> (c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief[.]

*Id.* at § 26.

Applying these rules to the facts of this case leads us to the following conclusions:

(1) The CBOE decision precludes further litigation on plaintiffs' allegations, arising under exchange rules, concerning Shearson's negligent hiring of Mayer, Shearson's negligent supervision of Mayer, and the allegation that Mayer encouraged and permitted the plaintiffs to enter into investment positions that were unsuitable to their investment objectives. These claims were all stated in the statement of claim submitted to the CBOE. This bar extends to all remedies, including punitive damages, that could follow from these precluded claims, whether or not the arbitration panel would have had the power to grant it. To hold otherwise would completely undermine arbitration as a method of settling disputes, as it would permit splitting of remedies and routinely duplicative litigation.

(2) Plaintiffs' other federal claims are not barred. An arbitration cannot preclude claims over which the panel did not have jurisdiction. *Restatement (Second) of Judgments* at § 26(c). The panel was not given this jurisdiction by the "statement of claim." Also, we assume that the arbitrators were familiar with the law, and that they would have applied the law in effect in the circuit in which they sat. In 1983, when the arbitration took place, far less was considered arbitrable than is today. At that time, neither claims under the Securities Act of 1933, 15 U.S.C.

§ 77a *et seq.*, nor claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, were considered arbitrable. *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (1933 Act claims not arbitrable); *Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 558 F.2d 831 (7th Cir. 1977) (1934 Act claims not arbitrable), *overruled, Shearson/American Express Inc. v. McMahon*, —— U.S. ——, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Additionally, in 1983, there was no reason to believe that RICO claims were arbitrable, as the question was settled by the Supreme Court only in 1987. *See McMahan*, 107 S.Ct. at 2344–46. We are aware of no decision by the Seventh Circuit predating the arbitration which discusses the issue.[10] As the question was, at the very least, open to doubt, we cannot hold that this claim was precluded. Plaintiffs should note, however, that in this circuit there is now no respondeat superior liability for RICO. *D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 967 (7th Cir.1988).

(3) As for the state common law claims, *res judicata* applies to the extent that these claims repeat allegations stated in the statement of claim submitted to the CBOE arbitration. *Res judicata* applies to each previously litigated claim even if plaintiffs now seek a remedy unavailable before the CBOE arbitrators.

█ Plaintiffs allege that Mayer falsified their financial statements, and that this falsification was part of a scheme to defraud involving other clients. The parties disagree as to whether the arbitrators considered this issue; at the very least this is a dispute as to a material fact. Indeed, the defendants have failed to show with "clarity and certainty" that the matter was considered by the arbitrators or that plaintiffs could have known about it before the date the plaintiffs say the relevant documentation was produced. In any case, this allegation states a claim for a fraud separate from the claims brought before the

CBOE; it is not part of the same "transaction" and is therefore not barred.

(4) Finally, the other state law claims are barred to the extent that they reallege claims rejected by the arbitrators.

In summary, we find that the CBOE decision precludes claims of Shearson's negligent hiring of Mayer, Shearson's negligent supervision of Mayer, and the allegation that Mayer encouraged and permitted the plaintiffs to enter into investment positions that were unsuitable to their investment objectives. Conversely, we find that the CBOE decision did not "determine" any other claims, e.g. claims of churning or conspiracy to defraud. The CBOE decision has no issue preclusive effect.

We grant partial summary judgment for defendants as described above. Defendants should prepare an order listing the counts in the Amended Complaint which will be affected by this opinion by April 20, 1988. Plaintiffs may file any objections by May 11, 1988.

*Professional Responsibility*

█ This is a long, complicated and, it would appear, exasperating case. The court's task of identifying the issues and rendering judgment according to law is not furthered by the vitriolic tone of the briefs, nor do vitriol and bombast well serve clients. We cite two, almost randomly chosen, examples: (1) "Defendants' counsel is eager to *invent* a scenario other than the truth by mischaracterizing Plaintiffs [sic] arguments." Plaintiffs' Response to Motion To Strike at 2 (emphasis in original). (2) "No conclusion can be drawn other than, yet again, plaintiffs have knowingly made a false statement of fact to this Court." Defendants' Reply Memorandum In Support of Amended Motion for Summary Judgment at 4.

The plaintiffs allege that the defendants' counsel, by mischaracterizing the plaintiffs' arguments, invented a scenario "other than the truth." Plaintiffs' Response to Motion To Strike at 2. There is, the plaintiffs allege, " 'no other conceivable explanation'

---

**10.** Some subsequent cases of at least tangential relevance are *Synder v. Smith*, 736 F.2d 409 (7th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984), and *Cook County v. MidCon Corp.*, 773 F.2d 892 (7th Cir.1985).

for the conclusions reached in Defendants' Reply Memorandum in Support of Amended For (sic) Summary Judgment." *Id.* The plaintiffs label the defense argument "sophomoric" and suggest that the "miscomparison reveals nothing except that Defendants are incapable of analogy and ignorant of the true facts." We are unable to deduce what was miscompared to what. Yet, despite the overblown character of this rhetoric, the plaintiffs have a point.

The allegedly false statement by the plaintiffs relates to a dispute over when the plaintiffs first learned of Mayer's alleged falsification of financial documents relating to other customers.[11] Plaintiffs state that they first learned of this after the arbitration. Plaintiffs' Memorandum In Opposition To Defendants' Amended Motion For Summary Judgement (sic) at 2. *See also* Plaintiffs' Rule 12(f) statement at ¶ 11. Defendants point to the examination of Cohen by plaintiffs' counsel during the arbitration as evidence that this is a lie.

We have given this passage the "careful scrutiny" requested by defendants,[12] and we find nothing within it that we can read as evidence that plaintiffs either had a copy of Schulman's complaint or were aware that it alleged the falsification of her customer financial statement. Nor do we find anything to indicate that plaintiffs' counsel already suspected that Mayer falsified anyone's financial data. Nor is there anything in the complaint filed on Schulman's behalf before the National Association of Securities Dealers Arbitration Department, Defendants' Reply Memorandum In Support Of Motion To Strike at Exhibit A, which would give notice of such an allegation. Indeed, the arbitration transcript cited by defendants is entirely consistent with the hypothesis that plaintiffs were aware of Schulman's complaint but had not seen the separate document containing the claim of falsification.

Defendants state that after reading the above section of the arbitration transcript, "no conclusion can be drawn other than" that plaintiffs have lied to the court. Defendants' Reply Memorandum In Support of Amended Motion for Summary Judgment at 5. Smith has twice stated under oath that Shearson did not produce Mrs. Schulman's records until after the arbitration, *see* Plaintiffs' Rule 12(f) Statement, Exhibit B at ¶ 5 ("Smith Affidavit"); Plaintiffs' Response to Motion to Strike, Exhibit E ("Smith Supplemental Affidavit"). Defendants accuse her of perjury in all but name. As the above demonstrates, the facts currently before the court fail to substantiate this allegation. Indeed, in addition to the two Smith affidavits, plaintiffs have submitted a letter dated February 6, 1986—well after the arbitration—which they allege was the first time that defendants provided plaintiffs or their representatives with copies of documents suggesting that Mayer had falsified Schulman's financial data. *See* Plaintiffs' Response to Motion to Strike at 6 (re ¶ 11); *Id.* at Exhibit C.

We caution counsel that further overheated rhetoric of this sort will be treated as a motion for Rule 11 sanctions against opposing counsel, and that unwarranted motions for sanctions are themselves sanctionable. *Local 106, Service Employees Int'l Union v. Homewood Memorial Gardens, Inc.,* 838 F.2d 958, 961 (7th Cir.1988).

---

**11.** It is undisputed that defendants produced legible copies of the plaintiffs' own financial statements, allegedly falsified by Mayer, no later than the second day of the arbitration. Supplemental Affidavit of Patrick J. O'Donnell [plaintiffs' former counsel].

**12.** The full text of the passage in question reads:

Q: He [Mayer] did have other customers make complaints against him did he not?

A: Yes.

Q: In those complaints in time roughly—were roughly contemporaneous with the events that my clients are complaining about; isn't that correct? For example, there's a complaint by—to refresh your recollection—by Louise Schulman who said that beginning in 1980, he was putting her in options and lost a lot of money. Do you recall that complaint?

A: Yes.

Q: And one of her grievances was that Mayer broadly recommended that Mrs. Schulman trade options, suggesting how successful he and others had been. Do you recall that?

A: I recall the case.

Q: It was part of the complaint. You don't have to agree that it's true.

A: I recall the case, yes. (T. 380–381).

## CONCLUSION

We grant partial summary judgment for defendants as described above. Defendants should prepare an order listing the counts in the Amended Complaint which they believe will be affected by this opinion by April 25, 1988. Plaintiffs may file any objections by May 16, 1988.